No. 46          October 3, 2013          271

IN THE SUPREME COURT OF THE
STATE OF OREGON

Sara Marie ZIMMERMAN,
*Respondent on Review*,

*v.*

ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY,
an Illinois corporation;
and Allstate Insurance Company,
an Illinois corporation,
*Petitioners on Review.*

(CC 0812-17951; CA A146460; SC S060011)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 26, 2012; resubmitted January 7, 2013.

Joel S. DeVore of Luvaas Cobb, Eugene, argued the cause and filed the briefs for petitioners on review.

Gordon S. Gannicott of Hollander, Lebenbaum & Gannicott, Portland, argued the cause and filed the brief for respondent on review.

Charles Rabinowitz, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

LANDAU. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____
 * Appeal from Multnomah County Circuit Court, Judith Matarazzo, Judge. 246 Or App 680, 267 P3d 203 (2011).

**LANDAU, J.**

ORS 742.061(1) provides that, if a settlement of an insurance claim is not made "within six months from the date proof of loss is filed with an insurer" and the insured recovers more than any amount that the insurer has tendered, the insured is entitled to an award of attorney fees. ORS 742.061(3) provides a "safe harbor" for the insurer in underinsured motorist (UIM) cases: No attorney fees will be awarded if, within six months of the filing of the proof of loss, the insurer states in writing that it accepts coverage, that the only remaining issues are the liability of the underinsured motorist and the amount of damages due the insured, and that it consents to binding arbitration.

At issue in this case is what constitutes a "proof of loss" in a claim for UIM benefits and what suffices to trigger the safe harbor provision. The insured provided notice of an injury automobile accident to her insurer, but did not submit a UIM benefits claim at that time. Nearly two years later, the insurer learned of a possible UIM claim. Shortly after that, the insurer agreed in writing that it accepted coverage, that the only remaining issues were liability and damages, and that it was willing to submit to binding arbitration. After recovering on her UIM claim, the insured asked for attorney fees under ORS 742.061(1). The insurer claimed the benefit of the safe harbor provision of ORS 742.061(3). The Court of Appeals concluded, however, that the insurer did not send its safe harbor letter within six months of the insured's "proof of loss." According to the Court of Appeals, the "proof of loss" was the initial report of injury two years earlier. *Zimmerman v. Allstate Property and Casualty Ins.*, 246 Or App 680, 681, 267 P3d 203 (2011). We conclude that the initial report of injury did not provide sufficient information to constitute a proof of loss for a UIM claim and that the insurer's safe harbor letter sufficed to trigger the statutory exception to an attorney fee award. We therefore reverse the decision of the Court of Appeals.

## I.  FACTS

The relevant facts are not disputed. In 2006, plaintiff Sarah Zimmerman purchased an automobile insurance policy from Allstate. The policy included personal injury

protection (PIP) benefits with a limit of $15,000. It also included UIM coverage with a limit of $100,000 per person.

On December 22, 2006, Zimmerman was injured in an automobile accident when her car was struck by another that had failed to stop at a stop sign. Several hours after the accident, Zimmerman gave a recorded statement to the Allstate claims department. She explained that her car had been totaled, that she had been injured, and that the other driver, Louis Alvis, had admitted liability and had been cited by the police. The record does not disclose whether Zimmerman reported any information about whether Alvis was insured at that time, but the parties assume that Alvis was insured.

On January 26, 2007, an Allstate representative wrote to Zimmerman explaining the nature of PIP benefits and enclosed an application for those benefits, along with a medical authorization form and a provider form, which allowed Allstate to obtain accident-related medical records. Zimmerman filled out the application and returned it to Allstate along with the signed medical authorization and provider forms. In the following months, Allstate corresponded with Zimmerman or her attorney concerning medical records on a number of occasions. Allstate ultimately paid Zimmerman $13,310.72 in PIP benefits over the course of the next year.

In December 2007, Zimmerman's treating physician informed Allstate that Zimmerman "continues to suffer from left neck and upper back pain," which can cause headaches. The physician also reported that X-rays showed a reversed cervical spine and that medical research suggested the possibility of future instability in that area. But no further bills for medical expenses were submitted to Allstate after that date.

In July 2008, Zimmerman's lawyer sent a demand letter to Safeco, Alvis's insurer. At that point, counsel thought that Zimmerman's claim had a value in excess of $100,000.

On September 24, 2008, a Safeco adjuster telephoned an Allstate employee to advise that Zimmerman would likely pursue a UIM claim against Allstate. The Allstate employee referred the matter to a UIM adjuster within the

company. Two days later, Allstate's UIM adjuster sent a letter to Zimmerman's lawyer confirming that Allstate had received a notice of Zimmerman's accident in December 2006 and enclosing a proof of loss form for UIM benefits. The letter confirmed that there was Allstate UIM coverage in force at the time of the accident and that the insurer accepted coverage for the claim arising from the accident. "With confirmation of coverage," the letter continued, "we will focus our efforts to determine the only remaining issues of liability and damages in this claim." The letter explained that, "[i]f your client plans to make an uninsured or underinsured motorist claim with Allstate * * * [she] will need to complete the enclosed" form so that it could conduct its investigation of the UIM claim. The letter concluded by stating that, in the event that Allstate is unable to reach an agreement concerning the amount of the UIM benefits due under the policy, it was "willing to submit to binding arbitration of the claim." Apparently around the same time, Allstate also requested that Zimmerman provide information about Alvis's insurance coverage, specifically, his policy limits.

On October 3, 2008, Zimmerman's lawyer wrote Allstate to report that Alvis was insured by Safeco at the time of the 2006 accident. As for policy limits, the letter explained that, "[a]s you know, an insurance company usually does not voluntarily disclose its insured's policy limits, prior to a lawsuit being filed. You asked for a copy of Safeco's dec[larations] page. We do not have it and cannot compel it prior to litigation being filed." The letter went on to say that counsel nevertheless had learned that the policy had $25,000 in personal injury limits. The letter further explained that Safeco had acknowledged that the claim had a value of $25,000, but that it had not yet tendered the policy limits. The letter concluded with the following:

"PROOF OF LOSS

"I feel that this letter coupled with the demand letter to Safeco, dated July 8, 2008, is a sufficient proof of loss for both the UIM claim as well as the PIP wage loss claim. If you disagree, let me know ASAP and provide the forms necessary to complete the proof of loss."

Five days later, Safeco tendered its $25,000 policy limits to Zimmerman. Zimmerman's lawyer immediately informed Allstate of that fact and asked for permission to accept the tender in exchange for a full release from further liability. In addition, counsel reminded Allstate of its UIM coverage with policy limits of $100,000 and that, once Safeco pays its policy limits, Allstate's liability would remain $75,000.

Safeco paid Zimmerman the $25,000. Allstate contested Zimmerman's claim for an additional $75,000. Zimmerman then initiated this action against Allstate for breach of its policy. The case was tried to a jury, which returned a verdict in plaintiff's favor in the amount of $100,000. The trial court deducted the $25,000 that Safeco had paid and entered judgment against Allstate for $75,000, plus costs.

Zimmerman requested attorney fees under ORS 742.061(1). In relevant part, that statute provides,

"(1)   Except as otherwise provided in subsection[] *** (3) of this section, if settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

According to Zimmerman, because Allstate made no tender whatever in this case, she is now entitled to attorney fees, having prevailed at trial.

Allstate objected to the request, claiming the benefit of the exception set out in subsection (3) of that same statute, which provides:

"(3)   Subsection (1) of this section does not apply to actions to recover uninsured or underinsured motorist benefits if, in writing, not later than six months from the date proof of loss is filed with the insurer:

"(a)   The insurer has accepted coverage and the only issues are the liability of the uninsured or underinsured motorist and the damages due to the insured; and

> "(b)   The insurer has consented to submit the case to binding arbitration."

Specifically, Allstate contended that, within six months of the letter from Zimmerman that she denominated her "proof of loss," the insurer sent her a letter accepting coverage and consenting to arbitration.

Zimmerman responded with two arguments. First, she argued that, regardless of what she may have said in later correspondence, the proof of loss actually had been submitted nearly two years earlier, when she initially reported the accident to Allstate in December 2006. Because the insurer's letter accepting coverage and consenting to arbitration was not tendered within six months of that report, she argued, Allstate is not entitled to the benefit of the statutory safe harbor. Second, Zimmerman argued that, in any event, the safe harbor applies only when the insurer has accepted coverage and the only issues are liability of the underinsured motorist *and* damages. According to Zimmerman, because Allstate never disputed the tortfeasor Alvis's liability, the safe harbor simply does not apply. Aside from that, she argued, Allstate's consent to arbitration was inadequate.

Allstate replied that the December 2006 report could not constitute a proof of loss of a UIM claim, because of the nature of UIM liability. Allstate argued that, among other things, a predicate of UIM liability is ascertainment of the tortfeasor's insurance policy limits; depending on those limits, there may or may not be any UIM liability. The problem, Allstate asserted, is that Zimmerman did not report Alvis's policy limits, and there was no way for Allstate to determine them at that time. In support of that assertion, Allstate offered an affidavit of staff counsel, who testified that, based on his more than 20 years of experience in the industry, liability insurers do not reveal their liability limits because of concern for the privacy rights of their own policyholders. Allstate noted that, in fact, it had asked Zimmerman for that information, but her counsel explained that she could not obtain that information until litigation had been initiated.

The trial court agreed with Zimmerman on the second argument, that the attempt to take advantage of the statutory safe harbor failed because Allstate never contested Alvis's liability. The court explained that Zimmerman's reading of the statute in that regard actually "makes no sense to me," but it felt obligated to follow what it saw as the plain wording of the statute.

Allstate appealed. The Court of Appeals affirmed, albeit on a different ground from the one the trial court adopted. The court agreed with Zimmerman on the first of the two arguments that she had advanced to the trial court, namely, that the proof of loss had occurred when Zimmerman originally reported the accident to Allstate, which was more than a year before any attempt to satisfy the requirements of the safe harbor provision of ORS 742.061(3). The court explained that, although the initial report of the accident did not expressly include a request for UIM benefits, it was sufficient to constitute a "proof of loss" for a UIM claim because it included enough information to trigger a duty of the insurer to investigate. 246 Or App at 681-82.

## II. ANALYSIS

On review, Allstate argues that the Court of Appeals erred in concluding that Zimmerman's initial report constitutes a "proof of loss" of UIM benefits. According to Allstate, the information that Zimmerman provided in her request for PIP coverage did not include enough information to trigger a duty to investigate a claim for UIM benefits, because of the nature of UIM coverage. An obligation to provide UIM benefits, Allstate explains, does not arise until the tortfeasor's insurance coverage has been exhausted. In this case, the insurer argues, there was no mention of even the possibility that Alvis's Safeco limits were not adequate to cover Zimmerman's damages until September 2008, when a Safeco adjuster mentioned the possibility to an Allstate adjuster. Allstate notes that only two days after it received from Safeco notice of a possible UIM claim, it sent its letter to Zimmerman accepting coverage and offering to arbitrate damages. In that regard, Allstate argues, it is telling that Zimmerman herself denominated her October 2008 demand letter that followed—in which she first mentioned the subject of UIM coverage—her "proof of loss" for her UIM claim.

Zimmerman argues that her accident report in December 2006 provided Allstate with sufficient information to constitute a proof of loss for a UIM claim. She acknowledges that she did not mention UIM until nearly two years later. Nevertheless, she contends that, under this court's case law, a report is adequate to constitute a proof of loss if it provides enough information to enable the insurer to estimate its obligations. In this case, she argues, Allstate "knew the tortfeasor was at total fault, had liability insurance (likely the state minimum $25,000 in coverage) and that Zimmerman had $100,000 of UIM coverage under her Allstate insurance contract." In the alternative, Zimmerman argues that, even if the proof of loss was not filed until the October 2008 letter that she denominated as her proof of loss, Allstate's letter in which it purported to accept coverage and consent to arbitration was insufficient to trigger the statutory safe harbor of ORS 742.061(3), because that provision applies only when both the tortfeasor's liability *and* the amount owed to the insured remain in dispute. In this case, she contends, Allstate never disputed the tortfeasor's liability. She further argues that, in any event, the safe harbor does not apply because Allstate's consent to arbitrate was inadequate.

A.    *"Proof of Loss"*

We begin with the question whether Zimmerman's December 2006 accident report to Allstate constituted a "proof of loss" within the meaning of ORS 742.061(1) as to her claim for UIM coverage. The meaning of the term "proof of loss" is a question of statutory construction, governed by familiar rules that require us to examine the text of the statute in context, along with relevant legislative history and other aids to construction. *State v. Gaines*, 346 Or 160, 169-72, 206 P3d 1042 (2009).

As we have noted, ORS 742.061(1) provides that, if a settlement of an insurance claim is not made "within six months from the date proof of loss is filed with an insurer" and the insured recovers more than any amount that the insurer has tendered, the insured is entitled to an award of attorney fees. The statute does not define the term "proof of loss." Ordinarily, when the legislature has not defined a statutory term, we assume that the legislature used its

words consistently with their ordinary meanings. *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006). When the term has acquired a specialized meaning in a particular industry or profession, however, we assume that the legislature used the term consistently with that specialized meaning. *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005).

Such is the case with the term "proof of loss," which is a term of art that has long been used in the insurance industry. For at least a century, insurance policies have commonly conditioned certain coverage obligations on requirements that insureds provide a notice or proof of loss within a specified period of time. *See, e.g.*, *Weidert v. State Ins. Co.*, 19 Or 261, 275, 24 P 242 (1890) (timely proof of loss was a condition of coverage under the policy). The underlying rationale for such requirements is that, while insurers generally have the advantage over insureds in many aspects of the relationship,

> "[t]he major area in which the insurer works at a disadvantage is in information concerning the individual insured. In essence, except for relatively rare exceptions in which relevant information is available through public records or the insurer's own historical files, the insurer must rely on the insured or other interested parties to provide all details that affect the insurance relationship."

Lee R. Russ and Thomas F. Segalla, *Couch on Insurance 3d* § 186:1 (2005).

Ordinarily, what is sufficient to constitute a proof of loss under a policy depends on the type of insurance at issue. *See generally Couch on Insurance 3d* § 189:4 ("the contents of proofs of loss tend to vary by type of insurance"). But a common thread in all cases is that the sufficiency of information to constitute a proof of loss is evaluated in terms of the purpose of the requirement: to enable the insurer to estimate its rights and liabilities under the policy. *Id.*

Oregon law has long been consistent with that general principle. For example, in *Sutton v. Fire Insurance Exch.*, 265 Or 322, 509 P2d 418 (1973), the plaintiff was the victim of a burglary. He submitted a written list of the property stolen to the insurer the following day. The insurer disputed the value of some of the items that were stolen, and the

plaintiff initiated an action on the policy. The trial court directed a verdict in favor of the insurer on the ground that the plaintiff had failed to comply with the requirement in the policy that a written, *signed* proof of loss be submitted; apparently, there was no evidence that the plaintiff had signed the list of stolen property that he had submitted to the insurer. *Id.* at 323-24. This court reversed, concluding that the plaintiff had fully satisfied the purpose of the proof of loss requirement:

> "Substantial, as distinguished from strict, compliance of the proof of loss requirement is all that is required. 14 Couch, Cyclopedia of Insurance Law (2d ed) § 49:390; 3 Richards, Insurance § 547 (5th ed 1952); Vance, Insurance, 897-898 (3d ed 1951).

> "The test of whether the insured substantially complied with the proof of loss requirement should be whether the proof submitted by the insured fulfilled the purpose of the proof of loss:

>> "'The purpose of a provision for proof of loss is to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay. Its object is to furnish the insurer with the particulars of the loss and all data necessary to determine its liability and the amount thereof.' 14 Couch, supra, § 49:373, p 15."

*Id.* at 325.

Consistently with that understanding of the term as it is commonly used in insurance policies, this court's cases arising under ORS 742.061 and its predecessors have taken a pragmatic and functional, as opposed to strict and formalistic, approach in defining the term "proof of loss." It refers to any "event or submission" that accomplishes the purpose of a proof of loss, that is, "to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay." *Dockins v. State Farm Ins. Co.*, 329 Or 20, 28-29, 985 P2d 796 (1999). This court has emphasized that insurers "operate under a duty of inquiry." *Parks v. Farmers Ins. Co.*, 347 Or 374, 381, 227 P3d 1127 (2009). If a submission, by

itself, is ambiguous or insufficient to allow the insurer to estimate its obligations, it nevertheless will be deemed sufficient if it provides enough information to allow the insurer "to investigate and clarify uncertain claims." *Dockins*, 329 Or at 29.

As we have noted, what is sufficient to satisfy that test necessarily depends on the facts of each case and, in particular, on the nature of the insurance coverage at issue. Our prior cases illustrate the point.

In *Dockins*, for example, the plaintiffs discovered oil seeping into their basement. They immediately notified their homeowner's insurance carrier, State Farm, which denied coverage, explaining that, under the terms of the policy, it was not obligated to provide coverage for such seepage unless it contaminated groundwater. 329 Or at 22. Several weeks later, the Oregon Department of Environmental Quality (DEQ) initiated an administrative action against the plaintiffs for the release of oil from a tank on their property, which DEQ had determined had contaminated the groundwater. The plaintiffs initiated an action against State Farm for breach of contract, alleging in their complaint that they would incur costs and expenses to remediate the leaking oil tank, which had resulted in groundwater contamination. *Id.* at 23. Approximately nine months later, the parties settled. *Id.* at 24.

The plaintiffs then moved for an award of attorney fees under ORS 742.061. State Farm opposed the motion, arguing, among other things, that the plaintiffs had never filed a proof of loss as to their third-party claim for liability for the clean-up costs. 329 Or at 24. The plaintiffs responded that their complaint constituted such a proof of loss. *Id.* at 26. State Farm rejoined that the complaint could not constitute a proof of loss because it failed to substantiate its allegation that there had been groundwater contamination and, in any event, did not allege the remediation costs with adequate specificity. *Id.* at 30.

This court concluded that the complaint sufficed to constitute a proof of loss within the meaning of the statute, explaining that the allegations provided enough information to enable State Farm to determine its existing liability:

> "In our view, those allegations in plaintiffs' complaint were sufficient to qualify as a proof of loss under ORS 742.061 \*\*\*. State Farm acknowledges that its duty to defend \*\*\* would be triggered if there were a claim against plaintiffs based on groundwater contamination. The complaint alleges such a claim. Although it is true that the DEQ demand was not attached to the complaint and that State Farm was not required to accept plaintiffs' characterization of the DEQ demand at face value, it also is true that State Farm easily could have ascertained whether plaintiffs' characterization was accurate."

*Id.* As for the specificity of the amount of liability alleged in that complaint, the court noted State Farm's contention that the allegation did not provide enough information on which to base a settlement offer but nevertheless concluded that, in advancing it, State Farm "ignores its duty of inquiry." *Id.*

This court also had occasion to apply its functional test for determining a proof of loss in *Scott v. State Farm Mutual Auto. Ins.*, 345 Or 146, 190 P3d 372 (2008). In that case, the plaintiff was injured in a car accident on January 8, 2002. The other driver was uninsured. She reported the claim to her insurer, State Farm, on January 11. She informed the insurer of her injuries, and the State Farm representative explained to her the various types of coverage available to her, including uninsured motorist benefits. She told the State Farm representative that she was not sure, at that point, whether she would pursue UM coverage. She was referred to State Farm's personal injury protection department, which sent to her a claim for PIP coverage. On January 20, she completed the form, which stated that the information provided in it would be used "to determine if you are entitled to benefits under the policyholder's insurance contract." State Farm received the form and processed a claim for PIP benefits, but it did not process a claim for UM benefits. 345 Or at 149. The following week, State Farm's claims representative spoke with the plaintiff, who informed him that she might pursue a UM claim. The claims representative immediately wrote the other driver to inform him that the plaintiff was making such a claim and asking him whether he in fact had insurance. *Id.* at 150.

Approximately six months later, the plaintiff initiated an action against State Farm for UM benefits. The claim ultimately settled, and the plaintiff asked for attorney fees under ORS 742.061. State Farm opposed the request arguing, among other things, that the plaintiff had failed to file a proof of loss *for a UM claim* more than six months before the settlement. Plaintiff responded that her original claim for benefits constituted such a proof of loss. *Id*. at 150-51.

This court sided with the plaintiff. The court explained:

"By January 11, State Farm was aware that plaintiff was receiving medical treatment for injuries sustained in a car accident with an uninsured motorist. By January 20, plaintiff had completed and submitted an 'application for benefits,' which stated that [t]he information provided will enable us to determine if you are entitled to benefits under the policyholder's insurance contract ***. The application included a description of the accident and the resulting injury to plaintiff, as well as contact information for the doctor who treated her."

*Id*. at 156. Moreover, the court noted, the fact that, shortly after that, State Farm sent a letter to the other driver informing him that the plaintiff was making a UM claim clearly indicated that State Farm was aware of the claim. In short, the court concluded, the plaintiff's submissions were "sufficient to enable State Farm to estimate its obligations regarding plaintiff's UM claim, or to do so after a reasonable investigation." *Id*.

Most recently, this court addressed the issue in *Parks*. In that case, the plaintiffs owned a rental house that was insured under a "Landlord Protector Package" issued by Farmers Insurance Company. The plaintiffs learned that police had discovered a methamphetamine lab in the house, had seized the house, and had placed it under quarantine. The plaintiffs called Farmers and told an agent about the seizure and quarantine of the property. 347 Or at 376. About a month later, the plaintiffs called the agent again and informed her that, to date, they had paid approximately $6,700 to clean up the property and expected to pay up to $3,000 more to get the property in shape to rent. The agent informed the plaintiffs that the damage was not covered because the

policy contained an exclusion for "pollution." *Id.* at 377. A year later, the plaintiffs initiated an action against Farmers for breach of contract. Among other things, they alleged that the property had suffered "accidental physical damage" that should have been covered under their landlord protection policy. According to the plaintiffs the damage included methamphetamine cleanup costs, vandalism, and diminution in the value of the property. *Id.* at 378.

The parties ultimately settled "all claims alleged in this matter," and the plaintiffs sought attorney fees under ORS 742.061. *Id.* at 378. Farmers objected, arguing that the plaintiffs had never submitted a proof of loss. The plaintiffs countered that their telephone reports of damage constituted the required proof of loss. Farmers replied that the telephone calls were insufficient, because they did not provide enough information to enable it to determine that it was liable for vandalism damage, which Farmers considered the only covered loss. *Id.* at 379.

This court rejected Farmers' contention. The court first noted that the pollution exclusion was not so clearly applicable that it excused Farmers from a duty to further investigate the claim. *Id.* at 386. In any event, the court continued, the fact that Farmers regarded vandalism damage as the only covered loss was not controlling; the plaintiffs clearly reported the methamphetamine cleanup costs to Farmers, and their complaint was framed broadly enough to include those costs. *Id.* at 388. Nothing in the terms of the settlement—which applied to "all claims in this matter"— excluded those costs. It follows, the court concluded, that the original telephone reports were adequate to constitute a proof of loss within the meaning of ORS 742.061. *Id.*

In each of the foregoing cases, this court concluded that the insured had provided enough information to constitute a "proof of loss," because the information was "sufficient to enable [the insurer] to estimate its obligations regarding [an insured's] claim, or to do so after a reasonable investigation." *Scott*, 345 Or at 156. In none of them, however, did the court address the sufficiency of a submission to constitute a proof of loss for a possible future UIM claim. As we have noted, the sufficiency of a submission to constitute a

"proof of loss" within the meaning of ORS 742.061 depends on the nature of the insurance coverage at issue. *See Couch on Insurance 3d* § 189:4 (proof of loss requirements may differ for UM/UIM claims because of nature of UM/UIM liability). That requires us to consider the nature of UIM insurance coverage generally.

State financial responsibility laws typically require motorists to maintain some form of automobile liability insurance. *See generally* Irvin E. Schermer and William J. Schermer, *Automobile Liability Insurance* § 1.1 (4th ed 2012); *Couch on Insurance 3d* § 109:1. If an at-fault driver who causes another person to suffer injury or loss has not complied with the state financial responsibility law, that driver is said to be "uninsured." *Automobile Liability Insurance* § 38.1. To provide compensation for victims of such accidents in which the tortfeasor failed to comply with the financial responsibility law, states enacted uninsured motorist, or UM, laws that required, as part of the financial responsibility law, every motor vehicle liability policy to include UM coverage, usually equal to the minimum amount of liability coverage that the tortfeasor should have obtained. *Id.*

Experience showed that to be inadequate in a number of situations, especially those in which the tortfeasor actually complied with the minimum requirements of the financial responsibility law, but the coverage was inadequate to fully compensate injured persons. The tortfeasor was not *un*insured, as he or she had complied with the financial responsibility law. But he or she was regarded as *"under*insured," because of the inadequacy of the minimum coverage that applied. In response to that inadequacy, states adopted underinsured motorist, or UIM, statutes that require certain UIM coverage as part of all automobile liability policies. *Id.*

States adopting UIM statutes generally have adopted one of two different approaches to defining precisely what it means to be "underinsured." Some states define a driver to be underinsured if the driver's liability limits are inadequate to cover an injured person's damages. That is known as the "uncompensated damage" or "limits-to-damage"

approach. Others define a driver to be underinsured if the driver's liability limits are less than the injured person's liability limits. That is known as the "comparison of limits" or "limits-to-limits" approach. *Id.* § 38.3.

Oregon automobile liability insurance law has tracked the essential pattern that we have described. *See generally [Vogelin v. American Family Mutual Ins. Co.](#)*, 346 Or 490, 501-06, 213 P3d 1216 (2009) (describing history of legislative adoption of Oregon UM and UIM statutes). The legislature first adopted a financial responsibility statute requiring each driver to maintain a certain level of liability insurance. ORS 742.450(4) provides that, "[e]very motor vehicle liability insurance policy issued for delivery in this state shall provide liability coverage to at least the limits specified in" the motor vehicle code. The motor vehicle code, in turn, sets the minimum limit at $25,000 for "bodily injury to or death of one person in any one accident." ORS 806.070(2)(a).

In 1967, the legislature adopted a requirement that all motor vehicle liability policies in Oregon provide UM coverage. ORS 742.502(1). And, in ORS 742.502(2)(a), it required that the amount of UM coverage generally must be at least the amount required for bodily injury liability coverage under ORS 806.070, the state financial responsibility law.

In 1981, the legislature then added to the statutory scheme a requirement that automobile liability insurance policies include UIM coverage as well, adopting the comparison of limits approach to defining what constitutes an "underinsured" motorist:

> "[u]nderinsured motorist coverage [must provide for damages] \*\*\* arising out of the ownership, maintenance or use of a motor vehicle with *motor vehicle liability insurance that provides recovery in an amount that is less than the insured's uninsured motorist coverage.* Underinsurance coverage shall be equal to uninsured motorist coverage less the amount recovered from other motor vehicle liability insurance policies."

ORS 742.502(2)(a) (emphasis added.) *See also [Mid-Century Ins. Co. v. Perkins](#)*, 344 Or 196, 212-16, 179 P3d 633 (2008)

(Oregon's UIM statute adopts "limits-to-limits" approach to defining an "underinsured" driver).

It is worth emphasizing that, regardless of which approach a state takes to define what constitutes "underinsured," the threshold determinant is the tortfeasor's policy limits. Under either approach, in the absence of that information, it cannot be determined whether that driver is underinsured. Under Oregon law, for example, if the tortfeasor's insurance policy limits equal the insured driver's uninsured motorist coverage limits, there is no UIM liability. *Mid-Century Ins. Co.*, 344 Or at 218 (plaintiffs were not entitled to UIM benefits because they were "injured by motorists with liability limits equal to the limits of their own uninsured motorist coverage").

It is also worth emphasizing that the comparison of the tortfeasor's and the insured's liability limits produces only an insurer's *potential* UIM liability. The insurer's *actual* UIM liability depends on the amount of the injured insured driver's damages and any payments that have been received from the tortfeasor. *See Vogelin*, 346 Or at 506 (UIM liability is determined "by subtracting the tortfeasor's liability payment from plaintiff's UM liability limit"). Indeed, an insurer has no UIM liability unless and until the insured has exhausted the limits of the underinsured tortfeasor's insurance coverage. ORS 742.542.

With this information about the nature of UIM coverage in mind, we turn to the sufficiency of Zimmerman's December 2006 accident report to constitute a proof of loss for a UIM claim. It is undisputed that the information that Zimmerman provided to Allstate at that time mentioned nothing about a possible UIM claim. Zimmerman's argument is instead that the information that she provided, *coupled with information that her doctor provided over a year later*, was sufficient to trigger an investigation that conceivably could have revealed at least a potential UIM claim:

> "By December 31, 2007, at the latest, Allstate had complete information about Zimmerman's injuries, medical expenses and medical prognosis. Allstate knew the tortfeasor was at total fault, had liability insurance (*likely the state minimum*

$25,000 in coverage) and that Zimmerman had $100,000 of UIM coverage under her Allstate insurance contract."

(Emphasis added.) Thus, in Zimmerman's view, at least by December 31, 2007, Allstate did know both that Alvis's limits were only $25,000 and that Zimmerman's damages exceeded that amount. That contention, however, does not stand up to scrutiny.

First, there is a complete absence of evidence that Allstate was aware of Alvis's policy limits or that the insurer could have acquired that information before September 2008. The evidence, in fact, is to the contrary. It is undisputed that neither Allstate nor Zimmerman knew of Alvis's policy limits as of Zimmerman's first report in December 2006. It is also undisputed that Allstate had no way of requiring the tortfeasor to disclose his policy limits at that time. Allstate's staff counsel testified that, based on his more than 20 years of experience in the industry, liability insurers do not reveal their liability limits because of concern for the privacy rights of their own policyholders. Nothing in the record contradicts that testimony. In fact, when Allstate asked Zimmerman's counsel for that very information, counsel replied that she did not know the answer, explaining: "As you know, an insurance company usually does not voluntarily disclose its insured's policy limits, prior to a lawsuit being filed. You asked for a copy of Safeco's dec[larations] page. We do not have it and cannot compel it prior to litigation being filed."

Zimmerman nevertheless suggests that Allstate should have simply *assumed* that Alvis had the minimum amount of liability coverage. She offers no basis for the assumption, however. Alvis's liability limits could well have been $25,000, $50,000, $100,000, or $1 million.[1]

Zimmerman insists that, in any event, information about Alvis's policy limits was irrelevant in this case, because Allstate never attempted to find it. Indeed, she argues, "Allstate's estimate of Zimmerman's UIM benefit was always

---

[1] *Amicus curiae* Oregon Trial Lawyers Association suggests that Allstate could have acquired that information by subpoena or request for production. Allstate, however, was not a party to any litigation at that time and thus had no right to do either. *See generally* ORCP 36 A ("[p]arties" may obtain discovery by means of, among other things, requests for production).

zero, irrespective of liability policy limits." To begin with, Zimmerman offers no support in the record for her assertion that Allstate's estimate of her UIM benefit "was always zero." The fact that Allstate ultimately took that position does not mean that, nearly two years before the first mention of a UIM claim, Allstate had already determined it had no UIM liability. Aside from that, her argument injects an element of subjective intention—whether Allstate ever intended to pay UIM benefits—into what is essentially an objective inquiry: Whether the information that Zimmerman provided was sufficient "to afford the insurer an adequate opportunity for investigation * * * and to enable it to form an intelligent estimate of its rights and liabilities." *Dockins*, 329 Or at 29 (citations omitted); *see also Scott*, 345 Or at 156 (noting insurer's duty of "reasonable investigation").

Second, even supposing for the sake of argument that it is appropriate to assume that the tortfeasor's policy limits do not exceed the statutory minimum, there is likewise a complete absence of evidence that, as of even December 2007—a year after Zimmerman's initial accident report that she contends constituted her proof of loss—her damages exceeded those limits. Up to that point, her medical expenses totaled $13,310.72, an amount well within Alvis's assumed $25,000 liability limits. In December 2007, Zimmerman's doctor reported that Zimmerman continued to complain of neck and upper back pain and that there was an unspecified *possibility* of future headaches and spinal instability. Nothing in the physician's report suggested that Zimmerman currently experienced headaches or spinal instability or that she would incur any particular amount of medical expenses or other damages in the foreseeable future, much less that those expenses or damages would exceed Alvis's liability limits. Nor did the report, or any other information that Zimmerman supplied Allstate, suggest that she would be bringing a claim for damages in excess of those liability limits.

Contrary to Zimmerman's contentions, the record in this case shows that the first mention of a possible UIM claim did not occur until September 2008, when the tortfeasor's

insurer notified Allstate that its policy limits might not be adequate to cover the total damages that Zimmerman was asserting in her demand. Two days later, Allstate sent its letter asking Zimmerman for information about a possible UIM claim. Indeed, Zimmerman's own counsel responded in her October 3, 2008 letter with what she denominated a "PROOF OF LOSS," with the explanation that she felt, "this letter coupled with the demand letter to Safeco, dated July 8, 2008, is a sufficient proof of loss for both the UIM claim as well as the PIP wage loss claim. If you disagree, let me know ASAP and provide the forms necessary to complete the proof of loss."

In those circumstances, we conclude that the information that Zimmerman provided to Allstate in December 2006 was not sufficient even to trigger an obligation to investigate a UIM claim. Not until the September 2008 call from Safeco did Allstate learn of the possibility of a UIM claim. Assuming for the sake of argument that that call, combined with the information that Zimmerman had earlier provided, constituted information "sufficient to enable [Allstate] to estimate its obligations" or at least "to do so after a reasonable investigation," *Scott*, 345 Or at 156, that leads to the conclusion that the proof of loss was filed in September 2008, well within six months of Allstate's filing of its safe harbor letter.

In reaching that conclusion, we emphasize—as we have done in other cases—the importance of an insurer's "duty of inquiry." *Dockins*, 329 Or at 28. For a transmittal of information to constitute a "proof of loss" within the meaning of the statute, it is not necessary that it enable the insurer to determine precisely its obligations. *Id.* In the context of a UIM claim, it is likewise not always necessary for the information to include the tortfeasor's precise limits. In this case, for example, Allstate received information from Safeco about the likelihood of a UIM claim, which information triggered Allstate's safe harbor letter—even before Allstate knew Alvis's precise UM limits. As we noted, determining what constitutes a "proof of loss" is a pragmatic and functional inquiry.

B.  *Statutory "Safe Harbor"*

We turn, then, to Zimmerman's alternative argument that, even if the proof of loss was not filed until October 2008, Allstate's letter purporting to accept coverage and consent to arbitration was insufficient to trigger the statutory safe harbor of ORS 742.061(3). Zimmerman contends that the Allstate letter was deficient in two respects, each of which we address in turn.

Zimmerman first asserts that the statutory safe harbor provision applies only when both the tortfeasor's liability *and* the amount owed to the insured remain in dispute. In this case, she contends, Allstate never disputed the tortfeasor's liability. Allstate responds that Zimmerman misreads the statute that sets out the safe harbor. According to Allstate, that statute provides that the safe harbor applies if an insurer sends *a writing* in which it states that it accepts coverage and acknowledges that the only issues are the tortfeasor's liability and the amount owed to the insured. It is undisputed, Allstate notes, that it sent such a writing.

The issue, once again, is one of statutory construction. ORS 742.061(3) provides that the attorney fee provision of subsection (1) of that statute does not apply if an insurer timely responds to a proof of loss with a writing that spells out certain information:

"(3)  Subsection (1) of this section does not apply to actions to recover uninsured or uninsured motorist benefits if, in writing, not later than six months from the date proof of loss is filed with the insurer:

"(a)  The insurer has accepted coverage and the only issues are the liability of the uninsured or underinsured motorist and the damages due the insured; and

"(b)  The insurer has consented to submit the case to binding arbitration."

In this case, it is undisputed that, within six months of the October 3, 2008 letter that Zimmerman denominated her proof of loss, Allstate sent her a letter that accepted coverage and stated that "the only remaining issues" were the tortfeasor's liability and the amount of damages. Thus, Allstate did all that the statute requires.

Zimmerman does not dispute that Allstate sent such a letter. She asserts, however, that Allstate's acknowledgement of the remaining issues of liability and damages was mere "lip service" and should not be taken seriously. Zimmerman notes that, at least by the time of trial, Allstate did not contest the tortfeasor's liability. As we have noted, it was on that ground that the trial court concluded that the safe harbor provision of ORS 742.061(3) did not apply.

The statute, however, does not by its terms specify that, once an insurer has acknowledged that the only remaining issues are liability and damages, an insurer is thereafter foreclosed from conceding liability if it wants to avoid paying attorney fees under ORS 742.061(1), and we are loath to read such a requirement into the statute. ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted."). As the trial court correctly observed, such a reading of the statute "makes no sense," particularly in the light of the obvious purpose of the statute to provide an incentive for insurers to settle claims.

Zimmerman alternatively asserts that, in any event, the safe harbor does not apply because Allstate failed to agree to arbitration, as the statute requires. Allstate points out in response that, in its September 2008 letter, it clearly stated that, if the parties are unable to reach agreement on the amount of liability, Allstate "is willing to submit to binding arbitration." Zimmerman rejoins that such a simple statement is insufficient. Relying on this court's decision in *Bonds v. Farmers Ins. Co.*, 349 Or 152, 240 P3d 1086 (2010), she argues that what is required is a more formal, noncontingent offer to arbitrate.

As we have noted, ORS 742.061(3)(b) provides that the attorney fee provision of subsection (1) of that statute does not apply if an insurer timely supplies a writing that states, among other things, that "[t]he insurer has consented to submit the case to binding arbitration." In this case, Allstate declared in writing that, it "is willing to submit to binding arbitration." That declaration adequately expressed consent to submit to binding arbitration.

This court's decision in *Bonds* is not to the contrary. At issue in that case was the construction of a different statute, ORS 742.504(12)(a)(B). That statute provides that, unless "[t]he insured or the insurer has formally instituted arbitration proceedings" within two years of the date of an accident, certain claims for insurance coverage will be time-barred. In that case, the insurer sent the plaintiff policyholder a letter stating that, "'[s]hould we disagree'" on issues of liability and damage, the insurer "'consents to submit this matter to binding arbitration.'" 349 Or at 154. The issue was whether the insurer's statement that it was willing to arbitrate amounted to "formally institut[ing] arbitration proceedings" within the meaning of the statute. *Id.* at 155. This court concluded that conditional consent to arbitrate does not amount to actually instituting arbitration proceedings. *Id.* at 163-64. The court did not address, much less express a conclusion about, what constitutes "consent[] to submit to binding arbitration" within the meaning of ORS 742.061(3)(b).

We conclude that Allstate's letter accepting coverage and offering to arbitrate was sufficient to trigger the statutory safe harbor of ORS 742.061(3). The Court of Appeals erred in reaching a contrary conclusion.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.