# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 73638-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| JORGE RENE PEREZ BARROSO | ) | |
| AND ROILAND FERNANDEZ | ) | UNPUBLISHED OPINION |
| MEDINA, | ) | |
| | ) | |
| Appellants. | ) | FILED: November 2, 2015 |
| | ) | |

LAU, J. — Jorge Barroso and Roiland Fernandez Medina were each convicted in a joint trial of first degree burglary. Medina was also convicted of misdemeanor unlawful display of a firearm. They contend the trial court erred in excluding alleged drug evidence found in the victim's apartment, in refusing to give self-defense and reasonable doubt jury instructions, and in violating their confrontation clause rights by denying face-to-face interaction with witnesses. They also argue the deputy prosecutor improperly commented on their decision not to testify. Because the trial court properly excluded the alleged drug evidence, properly declined to give the defendants' proposed jury instructions, violated no confrontation clause rights, and the deputy prosecutor's comments were proper, we affirm the convictions.

## FACTS

On April 7, 2013, Travis Swan, Snezhana Stetsyuk, DeAngelo White, and two-year-old Kayliana were visiting Dijon Wiley and Kyla King at the Willow Apartments in Lakewood, Washington. Wiley stepped outside to smoke a cigarette and noticed a car parked behind his parking space. Wiley and Fernandez Medina argued when Wiley asked him to move the car. Fernandez Medina told Wiley, "I have something for you. I will be right back." Report of Proceedings (RP) (Jan. 13, 2014) at 376. Fernandez Medina drove off.

Fernandez Medina returned about 10 to 30 minutes later with Jorge Barroso, Barbaro Gener Ono, and Lazaro Valle-Matos. They walked up to Wiley's apartment door. One of them was carrying a wooden baseball bat. Fernandez Medina knocked on the door and said, "I am back." RP (Jan. 13, 2014) at 386. Stetsyuk and King told them repeatedly to leave and that a child and weapons were in the house. Fernandez Medina told Wiley to come out. The door was forced open. Fernandez Medina immediately hit Wiley in the face. Fernandez Medina and Wiley struggled just inside the door of the apartment. Valle-Matos, Ono, and Barroso tried to follow Fernandez Medina through the door. Valle-Matos held a large knife. White had a gun that he always carried with him. When White saw Valle-Matos' knife, he said that he was armed and would shoot. White shot Valle-Matos when Valle-Matos tried to stab Wiley.

After the gunshot, Fernandez Medina, Barroso, and Ono quickly left. Valle-Matos died later that evening from the gunshot wound. Police responded and arrested Fernandez Medina, Barroso, and Ono nearby.

2

The State charged Barroso and Fernandez Medina with one count of first degree burglary and one count of second degree assault. Prior to trial, the State moved to exclude evidence of two packages of white powder police found underneath a mattress in Wiley's apartment. Defense counsel claimed the drug evidence was admissible as part of the res gestae of the crime, to explore possible bias on the part of the State's witnesses who were not charged with any drug offenses, and to challenge the thoroughness of the police investigation. The trial court granted the motion on grounds that the evidence was more prejudicial than probative. The trial court allowed defense counsel to ask witnesses about alcohol or drug use on the night of the incident to test their perceptions.

After the State rested its case, the court dismissed the second degree assault charge against Barroso. The jury convicted Barroso and Fernandez Medina each of one count of first degree burglary on accomplice and principal liability. The jury found Fernandez Medina not guilty of second degree assault but guilty of the lesser included misdemeanor crime of unlawful display of a weapon. The defendants appeal.[1]

## ANALYSIS

### Exclusion of Alleged Drug Evidence

Fernandez Medina argues the trial court abused its discretion when it excluded evidence that police discovered two small bags of white powder in Wiley's apartment. No tests were performed on the white powder substance. This court reviews a trial court's evidentiary rulings for an abuse of discretion. State v. Grier, 168 Wn. App. 635, 644, 278 P.3d 225 (2012). A trial court abuses its discretion only if the decision is

---

[1] Codefendant Barbaro Ono is not part of this appeal.

3

"manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Fernandez Medina contends that this alleged drug evidence was admissible as (1) res gestae evidence, (2) evidence of bias, or (3) to impeach the thoroughness of the police investigation. Because the evidence was unrelated to the crime charged and the trial court allowed defense counsel to ask Wiley about drug use and any preferential treatment from the State, the trial court did not abuse its discretion when it excluded the alleged drug evidence.

Res Gestae

First, Fernandez Medina argues the alleged drug evidence discovered in Wiley's apartment was relevant as "res gestae" evidence. Washington courts have recognized that "res gestae" or "same transaction" evidence may be admissible to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place." State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (quoting State v. Tharp, 27 Wn. App. 198, 204, 616 P.2d 693 (1980)). Fernandez Medina contends that the alleged drug evidence would have "completed the picture" of the events leading up to the shooting because drug use could explain Wiley's angry and belligerent behavior.

But the alleged drug evidence Fernandez Medina sought to admit was not immediately relevant to the context of the charged crime. For example, in State v. Trickler, 106 Wn. App. 727, 25 P.3d 445 (2001), Trickler was charged with possession of a stolen credit card. Trickler, 106 Wn. App. at 733. The State sought to admit as res gestae evidence that police discovered at least 16 pieces of other stolen property in Trickler's possession. Trickler, 106 Wn. App. at 734. The court held that the trial court

4

abused its discretion when it admitted this evidence because it was not immediately relevant to the charged crime and unfairly prejudiced the defendant:

> While the events leading up to the discovery of the stolen credit card were relevant and somewhat probative, it was not shown that Mr. Trickler's possession of other allegedly stolen items was an inseparable part of his possession of the stolen credit card, which is the test commonly used in this state . . . After hearing the witnesses' testimony and seeing evidence of 16 pieces of stolen property, the jury was left to conclude that Mr. Trickler is a thief.

Trickler, 106 Wn. App. at 734 (emphasis added). Similarly, Fernandez Medina has failed to show that the alleged drug evidence discovered in Wiley's apartment was an inseparable part of the circumstances surrounding the charged crime. If the alleged drugs had somehow been related to the altercation between Wiley and Fernandez Medina, it might be admissible as res gestae evidence. But Fernandez Medina has failed to show that the alleged drug evidence is in any way related to the events leading up to the altercation other than police happened to discover two bags of white powder underneath Wiley's mattress well after the events occurred.

Fernandez Medina claims that the evidence might explain Wiley's behavior, but the trial court specifically tailored its ruling to allow defense counsel to inquire about Wiley's drug use. Typically, a witness' use of alcohol or other drugs at the time of the events in question is generally admissible to show that the witness may not remember the events accurately. State v. Clark, 48 Wn. App. 850, 743 P.2d 822 (1987). But a witness' general use of alcohol or other drugs, unrelated to the specific events in question, is inadmissible for impeachment unless the proponent is able to offer some proof of the effects of the drugs upon the credibility of the witness at the time of trial. State v. Tigano, 63 Wn. App. 336, 818 P.2d 1369 (1991). Here, Fernandez Medina

5

argues the alleged drug evidence should have been admitted as res gestae evidence because it could explain Wiley's behavior. But the trial court already allowed defense counsel to ask the witnesses about any substances they may have used on the night in question:

> [A]ny issues regarding drugs found are irrelevant <u>except to the extent that the parties can present evidence that any witness and/or defendant appeared to be impaired or under the influence of a controlled substance and/or alcohol.</u> That type of evidence, impairment, that might affect conduct is generally admissible. This is not a drug-related case, and so, in general, other—unless there is evidence that this dispute was over some sort of a drug deal or something of that nature, it's not relevant to the proceedings as I see it.

RP (Jan 13, 2014) at 279-80 (emphasis added). The trial court allowed defense counsel to introduce drug evidence insofar as it was related to the witnesses' impairment. If defense counsel believed that drug usage might be relevant to Wiley's behavior, they were free to ask Wiley if he had used any substances that night. The record shows defense counsel specifically asked Wiley if anyone in his apartment had consumed any substances. The State objected, referring to its motion in limine seeking to exclude drug evidence. But the trial court overruled the State's objection, commenting that defense's question was "an appropriate question to ask." RP (Jan. 15, 2014) at 766. In other words, defense counsel was able to address drug evidence for the precise purpose they claimed it was relevant—whether Wiley's behavior or perception was impaired due to drug use.

Fernandez Medina relies heavily on <u>State v. Grier</u>, 168 Wn. App. 635, 278 P.3d 225 (2012). <u>Grier</u> is inapplicable here. Grier appealed her second degree murder conviction, arguing the trial court erred when it admitted res gestae evidence. Specifically, the trial court admitted evidence that Grier had insulted two witnesses and

threatened one of them with a gun. Grier, 168 Wn. App. at 643-44. The court held that the trial court did not abuse its discretion because this evidence illustrated "the continuing events leading to the murder." Grier, 168 Wn. App. at 647-48. Unlike this case, the res gestae evidence offered in Grier was directly relevant to factual issues underlying the second degree murder charge. Further, the evidence offered in Grier provided the crime's context by detailing the specific events leading up to the shooting. Fernandez Medina failed to show that the drug evidence here is relevant to his burglary and assault charge. The record shows defense counsel specifically asked Wiley whether he had consumed any substances that night. Under these circumstances, the trial court acted well within its discretion when it excluded the alleged drug evidence.

Bias

For similar reasons, Fernandez Medina has failed to show that the trial court should have allowed the alleged drug evidence to show that Wiley received preferential treatment from the State. Fernandez Medina contends that the State never charged Wiley with any drug offense despite finding two bags of white powder in his apartment. He claims declining to charge Wiley was a form of preferential treatment the State granted Wiley in exchange for his testimony. Therefore, the alleged drug evidence was necessary to show bias.

But Fernandez Medina was expressly allowed to cross-examine any witness regarding preferential treatment. Generally, a criminal defendant has a constitutional right to impeach a prosecution witness with evidence of bias. Davis v. Alaska, 415 U.S. 308, 316-18, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). However, "the scope or extent of such cross-examination is a matter within the discretion of the trial court." State v.

Kimbriel, 8 Wn. App. 859, 866, 510 P.2d 255 (1973) (quoting State v. Willis, 3 Wn. App. 643, 645, 476 P.2d 711 (1970)). Although the trial court here excluded the alleged drug evidence, he expressly allowed defense counsel to ask witnesses "whether police or prosecutors have offered or made any promises or threats for their testimony." RP (Jan. 13, 2014) at 291-92. This ruling was well within the trial court's discretion, particularly in light of the general rule that a witness' drug or alcohol use is inadmissible except to show that it impacted the witness' behavior or perception. See, e.g., Clark, 48 Wn. App. at 850.

Fernandez Medina cites Kimbriel to support his argument. But Kimbriel does not apply to this case because there is no evidence of preferential treatment here. Defense counsel essentially sought to admit the evidence for an improper purpose—to invite the jury to view Wiley in a bad light.

### Evidence of Inadequate Police Investigation

Fernandez Medina also argues that the alleged drug evidence was relevant to discredit the caliber of the police investigation. He claims that, because police did not test the substance, this amounts to "sloppy police work" sufficient to attack the State's theory of the case. Br. of Appellant Fernandez Medina at 18.

This argument fails. Although evidence of sloppy police work may be relevant to impeaching the thoroughness of a police investigation, such evidence is typically only relevant in limited circumstances. For instance, mishandled or inadequately collected evidence may be relevant when the allegedly tainted evidence is presented to show the defendant's guilt. See, e.g., State v. Rafay, 168 Wn. App. 734, 803, 295 P.3d 83 (2012). Poor police investigation may also be relevant to show that investigators failed

to pursue leads that the alleged crime was committed by someone other than the defendant. See United States v. Crosby, 75 F.3d 1343, 1347 (9th Cir. 1996). Here, the alleged drug evidence was irrelevant to the charged crimes. The presence or absence of the alleged drugs in Wiley's apartment had no bearing on whether Fernandez Medina committed either burglary or assault. Similarly, that evidence did not tend to show that someone else had committed the burglary or assault. The trial court did not abuse its discretion when it concluded that the alleged drug evidence was inadmissible as more prejudicial than probative.

### Self-Defense Instruction (Fernandez Medina)

Fernandez Medina argues the court erred when it declined to give his proposed self-defense instruction to the jury. The trial court did not abuse its discretion when it concluded that no evidence indicated Fernandez Medina acted in self-defense.

We review the trial court's decision not to provide a self-defense instruction for an abuse of discretion:

> The standard of review when the trial court has refused to instruct the jury on self-defense depends on why the court refused the instruction . . . If the trial court refused to give a self-defense instruction because it found no evidence supporting the defendant's subjective belief of imminent danger of great bodily harm, an issue of fact, the standard of review is abuse of discretion. If the trial court refused to give a self-defense instruction because it found no reasonable person in the defendant's shoes would have acted as the defendant acted, an issue of law, the standard of review is de novo.

State v. Read, 147 Wn.2d 238, 243, 53 P.3d 26 (2002). Here, the record shows that the trial court refused to give the self-defense instruction because it found no evidence supporting Fernandez Medina's subjective belief that he was in danger of injury. See RP (Jan. 21, 2014) at 1277 ("There is no testimony that your client believed on any

9

grounds that he was actually in danger of injury and acted in defense of himself . . . ."). Accordingly, an abuse of discretion standard applies here. Fernandez Medina does not argue that any other standard applies. A trial court abuses its discretion only if the decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Junker, 79 Wn.2d at 26.

When a defendant asks the trial court to instruct the jury on self-defense in an assault case,[2] the defendant has the burden of introducing some evidence demonstrating that he reasonably believed he was about to be injured. State v. Woods, 138 Wn. App. 191, 199, 156 P.3d 309 (2007). The trial court must view the evidence in the light most favorable to the defendant. State v. Callahan, 87 Wn. App. 925, 933, 943 P.2d 676 (1997). "Although it is essential that some evidence be admitted in the case as to self-defense, there is no need that there be the amount of evidence necessary to create a reasonable doubt in the minds of jurors on that issue." State v. Janes, 121 Wn.2d 220, 237, 850 P.2d 495 (1993) (quoting State v. McCullum, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983)). While this is a low burden, "it is not nonexistent." Janes, 121 Wn.2d at 237. Indeed, "a self-defense instruction is not available to an aggressor." State v. George, 161 Wn. App. 86, 96, 249 P.3d 202 (2011); see also State v. Currie, 74 Wn.2d 197, 198, 443 P.2d 808 (1968) ("In a prosecution for assault it is not improper to refuse an instruction on self-defense where there is nothing to justify a reasonable inference that the defendant acted in legitimate self-defense. The undisputed evidence

---

[2] There is some confusion as to whether Fernandez Medina presented his self-defense theory.

clearly establishes that <u>the defendant was the aggressor and precipitated the incident in question.</u>" (emphasis added) (citations omitted)).

The trial court did not abuse its discretion when it declined to give Fernandez Medina's proposed self-defense instruction because he failed to present any evidence that he had a reasonable belief that he was about to be injured. In fact, the record shows that Fernandez Medina "precipitated the incident in question," and therefore denying his proposed self-defense instruction was proper. <u>Currie</u>, 74 Wn.2d at 198.

As discussed above, the series of events culminating with the physical altercation began with a verbal argument between Fernandez Medina and Wiley in the parking lot of the apartment complex. Eventually Fernandez Medina left, telling Wiley, "I have something for you. I will be right back." RP (Jan. 13, 2014) at 376. Fernandez Medina went to Wiley's apartment complex to visit Wiley's neighbor, James Schlagel. Schlagel testified that he went over to Fernandez Medina's apartment shortly after Fernandez Medina argued with Wiley in the parking lot. Schlagel said that Fernandez Medina was in his apartment with three others. Fernandez Medina told Schlagel that "he had to get his gun." RP (Jan. 21, 2014) at 1164. Schlagel explained: "He [Fernandez Medina] went into his apartment and came out suddenly, real quick, and [came] running, and he had the pistol in his pants, and I could see him having it. He said, 'Get in the car.' I went . . . and the car was full, a couple—several people in there, four, I think, or something." RP (Jan. 21, 2014) at 1164. Schlagel said they drove back to the apartment complex where he lived. Then, Fernandez Medina and the other three men with him went to apartment 5—where Wiley lived—and "beat on the door and yelled out." RP (Jan. 21, 2014) at 1167.

Snezhana Stetsyuk, who was inside Wiley's apartment at the time, testified that she saw four men approach the door to the apartment. She recognized Fernandez Medina was among them. She remembered him from the earlier argument with Wiley. She testified that "they started banging on the door," so they gave them verbal warnings to leave: "We started yelling, 'there is a two-year-old girl in here. There is a licensed carrier with a gun in here and take your problems elsewhere, and leave us alone.' They kept on banging and banging . . . ." RP (Jan. 13, 2014) at 383. Kyla King, Wiley's wife, testified that Fernandez Medina was telling Wiley to come outside of the apartment. DeAngelo White, who was also in the apartment, testified that "someone was banging on the door. It wasn't a regular knock, so it's boom, boom, boom, boom. Someone is just banging on the door." RP (Jan. 14, 2014) at 514. He also stated that the individuals inside the apartment gave Fernandez Medina and the others verbal warnings to leave: "So Kyla [Wiley's wife] was also screaming, you know, 'We have a gun in here. My little sister is in here. You know, get away from here. There is a gun in here, we'll shoot.'" RP (Jan. 14, 2014) at 524.

Multiple witnesses testified that after the door opened, Fernandez Medina stated "I'm back" and punched Wiley in the face[3]:

> [STETSYUK:]     Fernandez said . . . "I am back." He said the B word and then punched him [Wiley] right away.

RP (Jan. 13, 2014) at 386.

> [WILEY:]     I started walking toward the door because, you know, clearly you just broke my door, and you know, I got hit in the face.
>               . . .
> [STATE:]     And is the person who hit you here in court?
> [WILEY:]     Yes.

---

[3] The record also shows that Valle-Matos reached in and tried to stab Wiley.

[STATE:]     Who was it?
[WILEY:]     The one with the cream shirt.
[STATE:]     So Mr. Fernandez Medina?
[WILEY:]     Yes.

RP (Jan. 15, 2014) at 735-37.

[WHITE:]     [T]he next thing I know . . . Fernandez and Dijon [Wiley] are face to face, and then Fernandez threw a blow at [Wiley].

RP (Jan. 14, 2014) at 517.

[STATE:]     What was the distance from you to Dijon [Wiley] at the time he was hit in the face?
[KING:]     I was probably not even like two feet away from him . . .
. . .
[STATE:]     Did you see the individual who hit him?
[KING:]     Yes.
[STATE:]     Go ahead and describe that person for us.
[KING:]     The person would be the defendant in the purple dress-up shirt.
[STATE:]     Okay. Now, up until this point in your testimony, had you seen Defendant Fernandez Medina up until this point?
[KING:]     No.
[STATE:]     Okay. So is the first time you saw him, this incident at the door?
[KING:]     Yes.
[STATE:]     How much of him did you see at that time?
[KING:]     I have seen—I have seen his face and basically everything that he was wearing and all of that pretty much. He didn't really talk much. It was that, "I'm back" and then hit him.

RP (Jan. 14, 2014) at 643-45. The witnesses' testimony shows that Fernandez Medina precipitated the incident in question here. He and Wiley got in an argument in the parking lot. Fernandez Medina left, but he told Wiley that he would be back and that he had something for him. He then went back to his apartment and got his gun and three friends—Barbaro Ono, Lazaro Valle-Matos, and Barroso. The four of them then returned to Wiley's apartment. Three of the four men outside Wiley's apartment were armed; Fernandez Medina had a gun, Valle-Matos had a knife, and either Ono or

Barroso had a baseball bat. They did not leave despite repeated verbal warnings from the individuals inside the apartment. Fernandez Medina banged on the door and told Wiley to come out. After the door was pushed open, Fernandez Medina punched Wiley.

Fernandez Medina claims that "there was evidence from which the jury could infer Wiley was the aggressor." Br. of Appellant Fernandez Medina at 22. But the citation following this assertion is a discussion between defense counsel and the trial court, not evidence. Fernandez Medina states that "not everyone saw the first slap, and the jury could have found given the evidence of Wiley's aggression, that Wiley struck first." Br. of Appellant Fernandez Medina at 23. Nothing in the record supports an inference that Wiley struck first. At best, the record shows that DeAngelo White may not have seen who threw the first punch:

> [MS. HIGH]: [Y]ou had indicated that you had heard a slap, unmistakable sound of someone being hit; is that right?
> [WHITE]: Yes.
> [MS. HIGH]: But you didn't actually see who threw that first punch, did you?
> [WHITE]: No.

RP (Jan. 14, 2014) at 569.[4] This does not show that Wiley struck first, particularly in light of the evidence from the other witnesses, discussed above, who all testified that Fernandez Medina hit Wiley.

Fernandez Medina also relies on other evidence suggesting that Wiley was acting aggressively. For example, White testified that after the argument with Fernandez Medina in the parking lot, Wiley said he would "be ready if anyone comes

---

[4] This exchange occurred during cross-examination. It is inconsistent with White's testimony during direct examination, where he stated that Fernandez Medina punched Wiley.

back." RP (Jan. 14, 2014) at 555. White also agreed that Wiley was "amped up" after the argument. RP (Jan. 14, 2014) at 552. When Fernandez Medina came back to Wiley's apartment, Wiley walked to the door and said, "What the F you want?" RP (Jan. 15, 2014) at 733. Fernandez Medina also points to the "threats" made by individuals inside the apartment. For example, King yelled that they had a gun and would shoot. RP (Jan. 14, 2014) at 524.

These few instances in the record do not "justify a reasonable inference that the defendant acted in legitimate self-defense." Currie, 74 Wn.2d at 198. Nor do they show that Fernandez Medina believed he was in danger of injury. Woods, 138 Wn. App. at 199. Fernandez Medina characterizes Wiley's behavior as "aggressive," but nothing in the record suggests that Wiley's behavior led Fernandez Medina to believe he might be in danger. On the contrary, Fernandez Medina precipitated the events culminating in the physical altercation. After the initial argument, Fernandez Medina warned Wiley that he would be back, he left the parking lot, he retrieved three friends and weapons, and then he returned specifically to confront Wiley. The record shows the individuals inside the apartment were afraid of Fernandez Medina and wanted him to leave. After the argument in the parking lot, King said they just waited in their apartment for the defendants to come back. She said that she was worried because she did not know what was going to happen and because there was a child in the house. She continued: "I told them to please go away because there was a child and there is weapons in the house . . . I yelled loud enough to where they could hear me through the door . . . I kept repeating it because they just kept knocking." RP (Jan. 14, 2014) at 650. The alleged "threats" Fernandez Medina claims support his self-defense argument were verbal

warnings intended to persuade Fernandez Medina to leave. Under these circumstances, the trial court did not abuse its discretion when it denied Fernandez Medina's proposed self-defense instruction.[5] See Currie, 74 Wn.2d at 198.

## Prosecutorial Misconduct

Barroso contends the prosecutor made improper statements during closing argument that allegedly commented on Barroso's failure to testify. Specifically, Barroso claims that the prosecutor stated that certain facts were "undisputed" and that there was "no evidence" showing contrary facts throughout closing argument. These comments, he argues, necessarily invited the jury to draw a negative inference from his decision not to testify. We disagree.

Both the federal and state constitutions protect a criminal defendant's rights to remain silent and be free from self-incrimination. U.S. CONST. amend. V; WASH. CONST. art. 1, § 9. A prosecutor violates these rights when he or she improperly comments on a defendant's refusal to testify. State v. Ramirez, 49 Wn. App. 332, 336, 742 P.2d 726 (1987). A prosecutor's statements are impermissible when they are of "such character that the jury would 'naturally and necessarily accept it as a comment on the defendant's failure to testify.'" Ramirez, 49 Wn. App. at 336 (quoting State v. Crawford, 21 Wn. App. 146, 152, 584 P.2d 442 (1978)). However, "a prosecutor may state that certain testimony is not denied, without reference to who could have denied it . . . and may comment that evidence is undisputed." State v. Morris, 150 Wn. App. 927, 931, 210 P.3d 1025 (2009) (citation omitted); see also State v. Ashby, 77 Wn.2d 33, 37, 459 P.2d 403 (1969) ("Surely the prosecutor may comment upon the fact that certain

---

[5] None of the defendants testified.

16

testimony is undenied, without reference to who may or may not be in a position to deny it and, if that results in an inference unfavorable to the accused, he must accept the burden . . . because the choice to testify or not was wholly his."). When a prosecutor asserts that certain facts are undisputed or that there was no evidence as to contrary facts, there is no violation unless "no one other than [the defendant] himself could have offered the explanation the State demanded." State v. Fiallo-Lopez, 78 Wn. App. 717, 729, 899 P.2d 1294.

All of the allegedly improper statements Barroso cites are permissible because they either (1) comment that evidence is "undisputed," or (2) state that certain testimony is not denied without any reference to who could deny it. See Morris, 150 Wn. App. at 931.

Barroso alleges that the following statements impermissibly comment on his refusal to testify:

The prosecutor stated that the evidence showed "what Dijon Wiley did and where he was at the time he sustained the slap or the hit or whatever it was that was done to him as soon as that door was open." RP (Jan. 22, 2014) at 1351. The prosecutor next said that this evidence was "all but undisputed." RP (Jan. 22, 2014) at 1351.

The prosecutor later commented that it was "virtually undisputed that inside that apartment was a two-year-old child," and that "there was no testimony from anyone about an invitation to come into that apartment." RP (Jan. 22, 2014) at 1352.

The prosecutor continued to illustrate the consistency of the witnesses' testimony:

> There is no evidence that Dijon Wiley, that when the door
> was opened, they stepped back so that he could step out and they

17

> could get it on in the parking lot, no evidence of that whatsoever. No one testified that that happened. There was no evidence that Valle-Matos backed away from the door in order to allow the fight to be brought outside, none of them.

RP (Jan. 22, 2014) at 1360.

After describing what the witnesses' stated about the events near the door of the apartment, the prosecutor asked, "in that description, do you see any evidence whatsoever of just being present at the scene as though one were a bystander?" RP (Jan. 22, 2014) at 1368.

"[T]hey were at the door not backing away, not saying, you know, there is gonna be a fight out here in the parking lot, no testimony of that whatsoever." RP (Jan. 22, 2014) at 1368.

Regarding the witnesses: "Is there any evidence that they all got together and got all their stories straight? None whatsoever." RP (Jan. 22, 2014) at 1370.

"Barroso . . . intentionally walked toward that apartment. Don't think there is whole lot of dispute about that. Intentionally positioned themselves at the door of the apartment. No dispute about that." RP (Jan. 22, 2014) at 1371.

These statements are permissible because the prosecutor did not directly or indirectly reference who could deny it. Many of the witnesses at trial could have denied these statements because they personally witnessed the events in question. In other words, Barroso was not the only person who could have denied these facts. Defense counsel had a complete opportunity to cross-examine each witness about the circumstances surrounding the incident in the apartment, the defendants' behavior, and whether the witnesses "got their stories straight." Therefore, the prosecutor's statements here do not directly or indirectly comment on Barroso's refusal to testify.

18

See Fiallo-Lopez, 78 Wn. App. at 729 (statements impermissible because "no one other than [the defendant] could have offered the explanation the State demanded."); see also Morris, 150 Wn. App. at 931-32 ("We agree with the State that it was no more improper for the prosecutor to comment on the consistency of the testimony of the six witnesses who testified in the State's case-in-chief than it was for defense counsel to point out the inconsistencies in that same testimony.").

Barroso relies primarily on Fiallo-Lopez and State v. Fleming, 83 Wn. App. 209, 921 P.2d 1076 (1996). These cases are distinguishable. In Fleming, the court held that the prosecutor's statements were impermissible because they "improperly shifted the burden to the defendants to disprove the State's case." Fleming, 83 Wn. App. at 214. Specifically, the prosecutor argued that the only way the jury could acquit was if they proved that the State's witnesses were lying:

> Ladies and gentlemen of the jury, for you to find the defendants, Derek Lee and Dwight Fleming, not guilty of the crime of rape in the second degree, with which each of them have been charged, based on the unequivocal testimony of [D.S.] as to what occurred to her back in her bedroom that night, you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.

Fleming, 83 Wn. App. at 213. The prosecutor than continued, stating there was no evidence that the witness had lied and that the defendants had not explained some of the evidence in the case:

> [T]here is absolutely no evidence . . . that [D.S.] has fabricated any of this or that in any way she's confused about the fundamental acts that occurred upon her back in that bedroom. And because there is no evidence to reasonably support either of those theories, the defendants are guilty as charged of rape in the second degree.
>
> . . . [I]t's true that the burden is on the State. But you . . . would expect and hope that if the defendants are suggesting there is a

19

reasonable doubt, they would explain some fundamental evidence in this [matter]. And several things, they never explained.

Fleming, 83 Wn. App. at 214. The prosecutor's statements in Fleming did three things: (1) they suggested that the only way the jury could acquit was if they found that the victim either lied or was confused, (2) they indicated there was no evidence that the victim had lied or was confused, and (3) they directly commented on the defendants' failure to explain the evidence in the case. The court held that the combination of these statements improperly shifted the evidentiary burden and infringed upon the defendants' Fifth Amendment rights. Fleming, 83 Wn. App. at 216.

Fleming is distinguishable here. First, the prosecutor here never directly or indirectly commented on the defendants' failure to explain any evidence. Second, the prosecutor's statements here did not improperly shift the evidentiary burden by suggesting the defendant's had failed to disprove anything asserted by the State's witnesses. The prosecutor merely stated that certain facts were "undisputed," "undenied," or that there was "no evidence" showing contrary facts, and he never indicated that the defendants were the only ones who could explain those facts. These statements are permissible. See, e.g., Morris, 150 Wn. App. at 931.

Next, Barroso relies on Fiallo-Lopez. In that case, the prosecutor stated there was "no evidence to explain why Fiallo-Lopez was present at the restaurant and at Safeway precisely when Lima and Cooper were there for the drug transaction." Fiallo-Lopez, 78 Wn. App. at 729. The prosecutor also "argued that there was no attempt by the defendant to rebut the prosecution's evidence regarding his involvement in the drug deal." Fiallo-Lopez, 78 Wn. App. at 729. Fiallo-Lopez is distinguishable for two reasons: first, unlike the prosecutor in Fiallo-Lopez, the prosecutor here never argued

that "there was no attempt by the defendant to rebut the prosecution's evidence." Fiallo-Lopez, 78 Wn. App. at 729. Second, the court in Fiallo-Lopez determined the prosecutor had committed misconduct in part because "no one other than Fiallo-Lopez himself could have offered the explanation the State demanded." Fiallo-Lopez, 78 Wn. App. at 729 (emphasis added). That is not the case here. Each allegedly improper statement Barroso cites in this case involves the prosecutor asserting that a certain fact is undisputed or that no evidence showed contrary facts. Unlike in Fiallo-Lopez, Barroso is not the only one who could explain those facts. Many of the testifying witnesses were present for those alleged events, and defense counsel had an opportunity to cross-examine each witness as to those alleged facts. None of the prosecutor's statements were improper. See Morris, 150 Wn. App. at 931 ("[a] prosecutor may state that certain testimony is not denied, without reference to who could have denied it . . ." (emphasis added)).

Finally, absent a timely objection, a prosecutor's alleged misconduct cannot be raised on appeal unless it was so flagrant and ill-intentioned that no curative instruction could have obviated the resulting prejudice. State v. Warren, 165 Wn.2d 17, 29, 195 P.3d 940 (2008). As discussed above, there was no misconduct here. Regardless, any prejudice to Barroso could have been corrected with a curative instruction. Further, we are reluctant to find prejudice when the trial court instructs the jury that a defendant's decision not to testify cannot be used to infer guilt or prejudice. See Morris, 150 Wn. App. at 932. The trial court provided such an instruction in this case. Barroso's prosecutorial misconduct claim fails.

21

Confrontation Clause

Barroso claims the trial court violated his rights under the confrontation clause when, at several points during the trial, he was unable to view witness testimony. But a few minor interferences with Barroso's view of a witness does not amount to a confrontation clause violation. Barroso argues that the confrontation clause requires a completely uninhibited line-of-sight between the defendant and the witness throughout an entire trial. However, such a rigid rule is not supported by case law or the underlying purpose of the confrontation clause. Rather, "substantial compliance" is usually adequate. Maryland v. Craig, 497 U.S. 836, 847, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (quoting Ohio v. Roberts, 448 U.S. 56, 69, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)).

The confrontation clause of the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. Amend. VI. The confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). Typically, the purposes of the confrontation clause are fulfilled when the witness is physically present, under oath, subject to cross-examination, and the trier of fact can observe the witness' demeanor. Maryland, 497 U.S. at 846.

However, the requirement for face-to-face confrontation is not without exception. A strict, literal reading of the confrontation clause would "abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." Roberts, 448

U.S. at 63. Accordingly, the Supreme Court has acknowledged that "[i]t is all but universally assumed that there are circumstances that excuse compliance with the right of confrontation." Maryland, 497 U.S. at 850 (quoting Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 10709 (1972)). "[S]ubstantial compliance with the purposes behind the confrontation requirement" is sufficient. Maryland, 497 U.S. at 847 (quoting Roberts, 448 U.S. at 69). Therefore, although there is a "'preference for face-to-face confrontation at trial,'" the Supreme Court has nevertheless "interpreted the Confrontation Clause in a manner sensitive to its purposes and sensitive to the necessities of trial and the adversary process." Maryland, 497 U.S. at 849 (quoting Roberts, 448 U.S. at 63).

Barroso identifies only five instances where defense counsel actually objected to an alleged inability to see either a witness or the jury. First, during jury selection, defense counsel objected to the arrangements of the courtroom, stating that he and Barroso could not see the entire jury panel. But the trial court offered an accommodation, which defense counsel accepted:

> MR. PEALE: I raised the issue previously about the arrangement of defendants and attorneys and the courtroom, I would like to make the Court aware that the greater part of the jury panel is blocked visually for me and my client. And looking across the array of attorneys and because of the architecture and the placement of the prosecutor, et cetera, much of the panel in the box is blocked out from view. I have a perfect view of the general audience area.

> THE COURT: I invite you to stand at any point in time, yourself. If you are unable to see a particular juror as opposed to the whole panel, I invite you to stand. If you remind me, I will ask jurors in the box to stand when they respond to a question.

23

If your client can't see a particular juror, I invite him to slide one direction or another a short distance so that—but not to stand, but so that he can see that particular juror. And so if you remind me, I will ask each juror to stand. There is no such thing as a perfect courtroom. This is one of the best in the county. Probably doesn't come up near the standards of the many courtrooms you've practiced in throughout the state, particularly King County, but we will do the best we can.

MR. PEALE:       Your Honor, it's always the judge that's the thing I rely upon, and I am very happy with Your Honor.

THE COURT:       Flattery gets you a lot around here, so keep it up. Anything else?

MR. PEALE:       <u>No. Thank you, Your Honor.</u>

RP (Jan. 8, 2014) at 235-36 (emphasis added). Next, Barroso cites a moment during testimony when the display of pictures was near a defendant's head. But again, the trial court made an accommodation that counsel accepted:

MR. JURSEK:       And then the only other issue was that when the pictures are shown, they are shown directly over top of my client's head, and I think over the course of the trial, that could become an issue that I am concerned about. I mean, just—

THE COURT:       We are all trying—

MR. JURSEK:       If he could sit off to the side, perhaps?

THE COURT:       That's fine. You can have the photos in front of you. We have a lot—we have three defendants here, lots of lawyers. We have interpreters. The Court's doing its utmost to make sure that accommodations are met. I need the cooperation of attorneys and not just complaints, if you will, to make a record.

If you have a specific suggestion, I'd certainly welcome it . . .

MR. JURSEK:       And my issue is not that we can't see the pictures and look at them. It's just every time a piece of evidence is shown, it's gonna be right below my client's head, and my concern is cumulatively, that can be prejudicial to my client.

THE COURT:       If it's a problem, you can bring it up one at a time . . .

MR. JURSEK:       Thank you, Your Honor. I think we are missing each other on the point of my objection.

24

THE COURT:      What is the point of your objection?

MR. JURSEK:     It was that there is going to be a photo of evidence shown, and every picture that's shown on the screen, my client's head is going to be immediately in plain view of that.

THE COURT:      I did miss that.

MR. JURSEK:     I believe over time, that's going to be prejudicial.

THE COURT:      Maybe he can slide three feet this way.

MR. JURSEK:     That would be great.  That would solve the problems.

THE COURT:      I don't have any problems with that.  I told counsel, you can stand whenever you want.  I don't want your clients to, but if they can slide one way or another.

MR. JURSEK:     Is it okay if he is there and I am here?

THE OFFICER:    (Witness nods head affirmatively)

THE COURT:      Thank you, Mr. Jursek.  Did you have anything further?

MR. JURSEK:     That was it, Your Honor.  Thank you.

RP (Jan. 13, 2014) at 357-61 (emphasis added).  During Snezhana Stetsyuk's testimony, defense counsel noted they could not see how the witness was describing a certain event, so the prosecutor asked the witness to describe the same event again for that attorney's benefit:

[STATE:]     What was their [the defendants'] positioning in relationship to each other?

[STETSYUK:]     They are in a—walking in a line, so all four.

[STATE:]     So single file?

[STETSYUK:]     Uh-huh.  (Witness answers affirmatively.)  Not like, you know, one, two, three.  They were just in a line like one, two, three, four.

[STATE:]     Okay.  So four walking together?

[STETSYUK:]     Yeah.

[STATE:]     Okay.  Now, you've indicated one of the people you did recognize—

MR. PEALE:      Excuse me, Your Honor.  I can see shoulders moving, and I understand there was a description being made, but I couldn't see it, and words haven't explained that to me, so.

[STATE:]     I can rephrase.

MR. PEALE:      So I don't know what the witness is saying by description.

THE COURT:      Okay.  Go ahead.

> [STATE:] For the benefit of Mr. Perez Barroso's lawyer, can you go ahead and describe for us again the manner in which the four individuals were walking toward the apartment?
>
> [STETSYUK:] They were walking like this as in one person, two person, three person, four person, all together.

RP (Jan. 13, 2014) at 380-81 (emphasis added). Barroso's attorney did not object following the State's accommodation. During DeAngelo White's testimony, defense counsel stated they could not see where the State was directing a laser pointer. Again, the trial court instructed the State to re-demonstrate and defense counsel did not object after this accommodation:

> [STATE]: So you are saying that the incident outside was happening more over in this direction?
>
> [WHITE:] Yeah, like right over that way, next to the boat.
>
> MR. PEALE: I am sorry, Your Honor. I didn't see where counsel—
>
> THE COURT: Move it again, please.
>
> [STATE:] As I am showing with the laser pointer, was the incident outside over toward this direction in relationship to the front door?
>
> [WHITE:] Yes.

RP (Jan. 14, 2014) at 492-93. A few moments later, counsel stated he could not see what White was drawing:

> [STATE:] Now, would you also show us and use something other than an "X," a different letter or a circle, for where the—what was happening between Dijon and Mr. Fernandez Medina?
>
> MR. PEALE: Excuse me. May I interrupt, Your Honor? Can we have the witness stand to the side?
>
> THE COURT: Let's let him draw first, then you can get as close as you'd like, Mr. Peale. It's probably easier for him to stand where he's able to utilize his hand and draw first. I will let him draw, and then if you are confused as to where he's drawn, please clarify.
>
> MR. PEALE: I am not confused. My client needs to be able to see.
>
> THE COURT: Absolutely. He doesn't need to see it exactly at the moment that it's drawn. Stand wherever you'd like as you draw what counsel has asked you about.

26

RP (Jan. 14, 2014) at 498. Defense counsel later objected to demonstrative testimony and the court stated he could clarify during cross-examination:

> MR. PEALE: Your Honor, I will object to the testimony as it was entirely blocked from view of my client. No drawing was made. It was demonstrated by movement of an object in a hand while speaking. We couldn't see where he was talking about. My client was blocked by the witness's back.
>
> THE COURT: Certainly. And, counsel, on cross-examination, you can use a pointer to clarify anything if you don't believe Mr. Schact [the prosecutor] has clarified it through questioning.

RP (Jan. 14, 2014) at 501-02. A few minutes later, the witness continued to use hand motions to describe testimony and the trial court repeatedly reminded the witness to testify such that the jury and counsel could see what he was doing:

> MR. PEALE: Your honor, I am gonna object to the demonstrative testimony by the witness when he is blocked from view of the jury. He is making motions, describing behaviors. Jury can't see it because he's behind the pillar.
>
> THE COURT: Okay. Try not to use your hands. Stay where you are at. Keep your voice up. I know it's a lot to ask of you. We have got a lot of people in a fairly small area, so try to keep your voice up and just answer the question.
>
> [WHITE:] Okay. I got it.
>
> . . .
>
> [WHITE:] So then I don't know. Like, I wasn't—like, I could not see past the wall, so like, I didn't know if like he had opened the door or what. I mean, you could hear—
>
> THE COURT: Let me just stop you just a second. If you just want him to point, I don't mind him being where he is. But if you are asking him to explain things, I really prefer the jury be able to see him, so you are gonna have to pick and choose which of the two you want him to do; point from there, or if you'd like him to testify, I'd like you to have him so he can be seen by all the jurors.
>
> [STATE:] One final question using the laser pointer . . . what I'd like you to do with the laser pointer is show where his feet were.
>
> [WHITE:] Okay. All right . . . Fernandez was standing right in front of him. There was a guy off to this side, a guy off to this side . . .
>
> THE COURT: Hold on a second. Counsel, as I mentioned, if you want him to point to something, fine where he is at. If not, we will have him where the jury can see him.

[STATE:]     Okay.

RP (Jan. 14, 2014) at 519-21. The record does not support Barroso's argument. These few interruptions during a crowded but otherwise normal trial do not amount to a violation of the confrontation clause. The record shows that, occasionally, counsel and/or defendants had difficulty viewing specific testimony from the witnesses—for example, pointing to diagrams or using hand movements to demonstrate certain events. But the record also shows the trial court's efforts to accommodate all of these interruptions.[6] Defense counsel appears to have accepted these accommodations in all cases, either explicitly on the record or implicitly by declining to object following the accommodation. Further, as the trial court noted, if defense counsel had an issue with any of the witness' testimony, he was free to clarify that testimony during cross-examination. Therefore, defense counsel was free to ask any witness to repeat earlier testimony—for instance, pointing to a diagram or drawing—in a way that his client could see it. "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities through cross-examination . . . ." Delaware v. Fensterer, 474 U.S. 15, 22, 106 S. Ct. 292, 88 L. Ed. 2d. 15 (1985). To the extent that any of these incidents infringed on Barroso's confrontation clause rights, those infringements were minimal, and the right to face-to-face confrontation is not absolute. Maryland, 497 U.S. at 837. Any interpretation of the confrontation clause must be "sensitive to its purposes and sensitive to the necessities

---

[6] The record shows the trial court's extraordinary efforts to accommodate all the participants in this physically cramped courtroom.

28

of trial and the adversary process." Maryland, 497 U.S. at 849 (quoting Roberts, 448 U.S. at 63).

The underlying purpose of the face-to-face requirement illustrates that there was no violation here. Face-to-face confrontation is preferred because it enhances the accuracy of fact-finding by reducing the risk that a witness will wrongfully implicate an innocent person. See Coy, 487 U.S. at 1019-20 ("It is always more difficult to tell a lie about a person to his face than behind his back.") The Supreme Court has also "noted the strong symbolic purpose served by requiring adverse witnesses at trial to testify in the accused's presence." Maryland, 497 U.S. at 847; see also Coy, 487 U.S. at 1017 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'" (quoting Pointer v. Texas, 380 U.S. 400, 404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)).

Barroso achieved a face-to-face confrontation with the adverse witnesses in this case within the meaning of the confrontation clause. The record shows that throughout nearly the entire trial the defendants had a full view of all the witnesses. It was only during these few instances when witnesses were asked to move to different parts of the courtroom, draw a diagram, point to something on a picture, or use their hands that the defendants had difficulty perceiving all the nuances of the witnesses' testimony. Barroso fails to explain how these few instances of logistical difficulty—all of which were immediately remedied by the trial court—in any way prevented a face-to-face confrontation of the witnesses such that those witnesses were somehow more likely to provide false testimony. Further, as mentioned above, Barroso had an opportunity to

explore any witness' testimonial deficiencies with cross-examination. Under these circumstances, Barroso cannot show that his confrontation clause rights were violated.

Barroso fails to cite any authority analogous to this case. Barroso primarily relies on Coy. In that case, the Supreme Court reversed the defendant's conviction when the trial court implemented a screen that was "specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony." Coy, 487 U.S. at 1020. The court recognized that circumstances in Coy were extreme, and that other exceptions might exist to the requirement that a defendant be allowed to confront adverse witnesses face-to-face. Coy, 487 U.S. at 1021 ("[T]he irreducible literal meaning of the Clause: 'a right to meet face to face all those who appear and give evidence at trial . . . . We leave for another day, however, the question whether any exceptions exist." (quoting California v. Green, 399 U.S. 149, 175, 90 S. Ct. 1930, 26 L. Ed. 2d. 489 (1970)). The court clearly answered this question in Maryland: "The Confrontation Clause does not guarantee criminal defendants an absolute right to a fact-to-face meeting with the witnesses against them at trial." Maryland, 497 U.S. at 836-37. Rather, this right must be sensitive to the necessities of the trial process. One of those necessities is adjusting to the physical layout of the courtroom. See State v. Dye, 178 Wn.2d 541, 309 P.3d 1192 (2013) (a trial court has broad discretion to make a variety decisions regarding the conduct of trial).

Even if these interruptions amounted to a violation of the confrontation clause, that violation was harmless error. See State v. Watt, 160 Wn.2d 626, 635, 160 P.3d 640 (2007) ("we hold that confrontation violations . . . are subject to a harmless error analysis."). A constitutional error is harmless if the court is convinced that beyond a

reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Watt, 160 Wn.2d at 635. Had the interruptions Barroso cites not occurred in this case, any reasonably jury would have reached the same result. As explained above, these interruptions posed minimal interference with the trial as a whole. The trial court accommodated each interruption. The record shows that, generally, these interruptions mainly affected defense counsel and not the jury. Given the overwhelming evidence in this case, any reasonable jury would have reached the same result absent the errors.

Reasonable Doubt Instruction

Both defendants argue that the trial court erred when it declined to use defense counsel's proposed reasonable doubt instruction. The State offered, and the court accepted, a reasonable doubt instruction providing: "If, from such consideration [of the evidence or lack of evidence], you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Clerk's Papers (CP) at 114. Defense counsel proposed, and the trial court rejected, a similar instruction without the "belief in the truth" language. RP (Jan. 22, 2014) at 1285. Citing State v. Emery, 174 Wn.2d 741, 278 P.3d 653 (2012), the defendants argue that by "equating proof beyond a reasonable doubt with a 'belief in the truth of the charge,' the jury instruction blurs the critical role of the jury." Br. of Appellant Fernandez Medina at 25.

Washington courts have repeatedly rejected this argument. State v. Federov, 181 Wn. App. 187, 200, 324 P.3d 784 (2014) (Finding no error where the trial court used the same "reasonable belief" instruction used here—WPIC 4.01—stating that "the 'belief in the truth' phrase accurately informs the jury its 'job is to determine whether the

State has proved the charged offenses beyond a reasonable doubt.'" (quoting Emery, 174 Wn.2d at 760)). The defendants nevertheless ask us to reconsider Federov. We decline to do so. Federov controls here. The trial court did not abuse its discretion when it denied defense counsel's proposed reasonable doubt instruction.

## Statement of Additional Grounds

Fernandez Medina provides five additional grounds for reversal under RAP 10.10. They are meritless.

## Motion to Sever

First, Fernandez Medina argues the trial court abused its discretion by declining to sever the trials. The trial court acted within its discretion when it declined to sever the trials.

A trial court has broad discretion to grant or deny a motion to sever and its decision will be reversed only upon a showing of manifest abuse of discretion. State v. Kalakosky, 121 Wn.2d 525, 537, 852 P.2d 1064 (1993). Fernandez Medina fails to articulate any reasons why the court abused its discretion here. Instead, he contends that the court "never fully ruled on this important issue." Statement of Additional Grounds (SAG) at 2. Fernandez Medina misreads the record. Fernandez Medina cites a passage during motions in limine where the trial court asked the State if it wanted to redact prejudicial statements from the codefendants or sever the trials. Fernandez Medina claims this passage shows the trial court "flip flopp[ed]." SAG at 2. The record clearly shows the trial court's concern over the admission of codefendant statements in violation of Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The trial court gave the State a clear choice: redact the offending statements or

sever the trials. RP (Jan. 8, 2014) at 220 ("So, unless the State is prepared to proceed with eliminating any reference at all to any other people in any of the statements of each defendant, . . . I am gonna sever the trials in this case . . . ."). The State elected to redact the prejudicial statements rather than face a severed trial.

### Introduction of Barroso's Statement

Fernandez Medina argues the trial court erred by introducing Barroso's statement. Fernandez Medina misreads the record. He cites the same passage from motions in limine where the trial court threatened to sever the trials if the State did not redact prejudicial codefendant statements. Fernandez Medina claims this passage shows that the State planned to "skirt" the trial court's order to redact the statements. SAG at 4. This passage shows the exact opposite; the trial court specifically instructed the State to redact the prejudicial statements or face a severed trial. Fernandez Medina argues Barroso's statement was admitted and read to the jury, but he does not cite anywhere in the record to support this assertion. This court is not obligated to search the record in support of claims made in a defendant/appellant's statement of additional grounds for review. State v. O'Connor, 155 Wn. App. 282, 229 P.3d 880 (2010).

### Expert Witness

Fernandez Medina argues Detective Brian Johnson was never properly disclosed or deposed as an expert witness. Like his previous arguments, Fernandez Medina fails to cite anything in the record supporting this assertion. See O'Connor, 155 Wn. App. at 282. Further, the record shows that the trial court properly allowed Detective Johnson's testimony. See RP (Jan. 15, 2014) at 907 ("I don't see anywhere here that there is any surprise evidence to you, any discovery violation. It's clear what the officer is going to

testify to. The report has been provided and submitted. Pictures have been provided. So your objection is overruled. State may proceed with this evidence."). Nothing in the record suggests the State failed to comply with discovery rules regarding expert witnesses. See CrR 4.7(a)(1); State v. Hutchinson, 135 Wn.2d 863, 876-77, 959 P.2d 1061 (1998). Therefore, the trial court did not abuse its discretion when it allowed Detective Johnson to testify. See Hutchinson, 135 Wn.2d at 882 (Evidentiary rulings reviewed for abuse of discretion).

### Detective Johnson's Testimony

Fernandez Medina claims that Detective Johnson's testimony included "generalizations, and impermissible inferences, and questionable opinions [that] are not supported by the factual evidence." SAG at 7. But Fernandez Medina fails to cite to anything in the record demonstrating any improper testimony. He only cites to a portion of the record where his attorney argues that Detective Johnson should not be allowed to testify. As discussed above, the trial court did not abuse its discretion when it allowed Detective Johnson to testify.

### In Court Identification

Finally, Fernandez Medina claims that "there were several [misidentifications] by the witnesses as to who was who, and as to who did what." SAG at 8. Specifically, he claims that Jeffery Taylor's in court identification was prejudicial, citing State v. Sanchez, 171 Wn. App. 518, 288 P.3d 351 (2012), and State v. Salinas, 169 Wn. App. 210, 279 P.3d 917 (2012). Fernandez Medina's argument relies on inapposite authority. Defense counsel had a full and fair opportunity to cross-examine Taylor and other witnesses about their identification testimony. Fernandez Medina's only citation to

the record is a portion of Jeffery Taylor's testimony where he identifies the defendants in court and then testifies that he saw them at the scene of the crime. This is not an impermissible identification statement within the meaning of the case law Fernandez Medina cites.

## CONCLUSION

For the foregoing reasons, we affirm.

WE CONCUR: