Argued and submitted May 2, affirmed December 19, 2012

3P DELIVERY, INC.,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT TAX SECTION,
*Respondent.*

Office of Administrative Hearings
T71030; A144953

295 P3d 83

Braden K. Core, Indiana, argued the cause for petitioner. On the briefs were John A. Anderson, and Steven A. Pletcher, Indiana.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Larry J. Brant, David L. Canary, and Garvey Schubert Barer, and Guy P. Michelson, Kevin C. Baumgardner, Emily Brubaker, and Corr Cronin Michelson Baumgardner & Preece LLP, Washington, and Richard G. Murphy, Jr., and Sutherland Asbill & Brennan LLP, Washington, D.C., filed

the brief *amicus curiae* for FedEx Ground Package System, Inc.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

In this unemployment tax case, petitioner 3P Delivery, Inc. (3PD), an interstate motor carrier, seeks judicial review of a final order of an administrative law judge (ALJ) of the Office of Administrative Hearings determining that 3PD had taxable payroll for all four quarters of 2006 and 2007 and affirming unemployment tax assessments by the Employment Department (the department). 3PD contends that the ALJ erred in determining that delivery services provided to 3PD by "owner-operator" truck drivers pursuant to a "leaseback" arrangement constituted taxable employment. Rather, 3PD asserts, those services fall within the scope of ORS 657.047(1)(b), which excludes from the definition of employment services performed by a driver in a vehicle under lease to a motor carrier. The facts are largely undisputed. We review the ALJ's order for errors of law and substantial evidence, ORS 183.482(8)(a), (c), and affirm.

Tax assessments of the department are *prima facie* correct, ORS 657.683(4), and an entity challenging an assessment has the burden to establish that it was not the employer of the person performing the services within the meaning of ORS 657.025(1) or that the payments subject to assessment should be excluded from taxation for some other reason. *Mitchell Bros. v. Emp. Div.*, 284 Or 449, 451, 587 P2d 475 (1978). In its challenge of the assessments at issue here, 3PD contends primarily that its drivers are subject to an exemption from employment under ORS 657.047(1)(b). Specifically, ORS 657.047 provides, in part:

"(1)  As used in this chapter, 'employment' does not include:

"* * * * *

"(b)  Transportation performed by motor vehicle for a for-hire carrier *by any person that leases their equipment to a for-hire carrier and that personally operates, furnishes and maintains the equipment and provides service thereto.*

"(2)  For the purposes of this chapter, services performed in the operation of a motor vehicle specified in subsection (1) of this section shall be deemed to be performed for the person furnishing and maintaining the motor vehicle."

(Emphasis added.) Under the statute, an exemption from employment exists when a person (1) leases their equipment to a for-hire carrier; (2) performs transportation services for that for-hire carrier; and (3) personally operates, furnishes and maintains the equipment. Under those circumstances, the services performed in operation of the vehicle leased to the for-hire carrier are deemed to be services performed for the person furnishing and maintaining the motor vehicle, rather than for the for-hire carrier. ORS 657.047(2). Thus, the person driving the vehicle is deemed to be an employee of the person furnishing and maintaining the vehicle and not of the for-hire carrier. In 3PD's view, its relationship with its drivers satisfies the statute's requirements for exemption, and its drivers were not employees of 3PD.

We draw our summary of the facts primarily from the ALJ's findings, which are supported by substantial evidence, as supplemented by undisputed evidence in the record. 3PD is a registered interstate for-hire motor carrier that provides "last-mile" delivery services for major retailers such as The Home Depot, Lowe's, Sears, and Office Depot. During the relevant time, 3PD's Oregon operations served only The Home Depot and its clients.

During the relevant time, 3PD entered into agreements with individuals who agreed to provide driving services for 3PD and who then leased delivery vehicles from 3PD and leased those same vehicles back to 3PD, and either operated those vehicles or hired others to do so. 3PD characterizes those individuals as "owner-operators." During the audit period, 3PD conducted all of its delivery business through owner-operators, who it considered to be independent contractors.

In recruiting owner-operators, 3PD advertised for drivers. Applicants who were hired were required to sign two documents bearing on the drivers' relationship with 3PD, the Independent Contractor Operating Agreement (ICOA) and 3PD's Motor Vehicle Lease Agreement (MVLA). The ALJ found that, as a practical matter, the terms of the two agreements were non-negotiable.

Pursuant to the ICOA, drivers agreed to provide delivery services to 3PD's customers. Under the ICOA,

the drivers agreed to lease their delivery vehicles to 3PD. The agreement provided that "CONTRACTOR [the driver] represents and warrants that CONTRACTOR has title to or is otherwise authorized to contract the Equipment and services to 3P Delivery." The drivers would then provide the delivery services using the vehicles that the drivers had leased to 3PD. 3PD would pay the drivers a weekly amount that purportedly included compensation for driving services as well as payment for 3PD's lease of the drivers' vehicles, although the latter amount was not separately broken out.

The ALJ found that, during the relevant period, the drivers with whom 3PD contracted did not own their own vehicles. Rather, the drivers leased their vehicles *from* 3PD pursuant to the terms of the MVLA; then, pursuant to the terms of the ICOA, the drivers leased those same vehicles *back to* 3PD, and used those leased-back vehicles to provide delivery services for 3PD. Drivers were not required to lease vehicles from 3PD in order to lease them to 3PD. The ALJ found, however, that as a matter of practice, 3PD did not contemplate a situation where drivers provided their own vehicles to 3PD, and did not want drivers to furnish their own vehicles. 3PD did not enter into an agreement with any driver who furnished his or her own vehicle; all drivers leased their vehicles from 3PD.

Drivers were paid weekly by 3PD and, pursuant to the MVLA, the consideration for the drivers' lease of the vehicles from 3PD was deducted weekly from the drivers' "settlement accounts." The ICOA and its addenda set forth the drivers' compensation for delivery services and described amounts that would be charged to the drivers' settlement accounts and deducted from their weekly compensation, including charges for the drivers' lease of a vehicle from 3PD, and flat fees for maintenance, fuel, and insurance. As noted, pursuant to the ICOA, drivers were also to be paid weekly for 3PD's lease of the drivers' vehicles, although that amount was never separately broken out. The ALJ found that 3PD did not establish that it actually paid consideration to drivers for 3PD's lease back of vehicles from the drivers.

Under the terms of the MVLA and the ICOA, the owner-operators were responsible for maintenance of and damage to the vehicles they leased from 3PD. However, the MVLA was a "full-service" lease, meaning that the drivers' lease payments and a weekly flat fee included the cost of maintenance services provided by 3PD's agent. Under the terms of the MVLA, 3PD established the schedule for maintenance, and drivers could not decline or forgo that maintenance of their vehicles. The drivers did not pay vendors or service providers directly for maintenance. Rather, all services were billed to 3PD, which then charged the drivers' accounts. The ALJ found that, as a matter of practice, drivers could not perform their own maintenance on the vehicles they leased from 3PD and then leased back to 3PD.

Under the terms of the MVLA, owner-operators who acquired their vehicles by lease from 3PD were free to use those vehicles under the authority of any other motor carrier. The MVLA provided that,

"[w]hen the Equipment is not being operated in the service of Lessor, Lessee may use the Equipment for other commercial or personal purposes, *subject to the terms and conditions of any lease agreement between Lessee and an Equipment lessor.*"

(Emphasis added.) Thus, drivers' ability to use the equipment for other purposes under the MVLA was constrained by the terms of the ICOA, which, in turn, required the driver to lease its equipment to 3PD. An addendum to the ICOA explained that drivers acknowledged that they could use the equipment in service of one or more motor carriers, subject to paragraph 12(a). However, paragraph 12(a) of the ICOA explained that the leased equipment was for 3PD's

"exclusive possession, control, and use for the duration of this Agreement. As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER."

The ALJ found that, as a matter of practice, drivers only drove for 3PD.

The MVLA ostensibly gave drivers the option to purchase the equipment,[1] but the ALJ found that it never happened in practice and that it was not intended by 3PD to happen. In contrast to the MVLA, the ICOA required drivers to return any vehicles, trailers, and other property to 3PD within 48 hours of termination. Additionally, the MVLA provided that a driver's lease of the vehicle from 3PD expired immediately upon termination of the ICOA. The ALJ found that during the relevant time, 3PD ignored the request of one driver who expressed an interest in purchasing a vehicle and, when the relationship ended, the driver was required to return the vehicle.

The ALJ found that, when the provisions of the ICOA, the MVLA, and 3PD's actual practices were considered together, they show that drivers had no interest in the vehicles by virtue of their leases from 3PD beyond their obligation to carry out delivery services for 3PD, and that 3PD retained all rights to the vehicles. The ALJ concluded for that reason that the MVLA lease was a legal fiction that did not confer any meaningful possessory interest that could be transferred. In that respect, the ALJ concluded, 3PD had failed to establish that the drivers had an interest in the vehicles that they could "furnish" to 3PD, as required by ORS 657.047(1)(b).

The ALJ further found that 3PD did not establish that it paid, or that its drivers had received, consideration for the lease back of their vehicles to 3PD. Thus, the ALJ concluded that, assuming there was a true lease of vehicles from 3PD to the drivers, there was not a lease-back contract from the drivers to 3PD, due to a lack of consideration. Thus, in that respect, the ALJ concluded, 3PD had failed to establish that the drivers leased their vehicles to 3PD, as required by ORS 657.047(1)(b).

---

[1] The MVLA stated:

"Provided that Lessee has made all rent payments to Lessor as required under this Lease, Lessee shall have the right and privilege, at its option, to purchase the equipment at the termination of this Lease or as otherwise as set forth in this Lease for the fair market value as determined by Lessor in its reasonable discretion."

Finally, the ALJ found that, although the ICOA spelled out the drivers' responsibility to maintain the equipment, in practice, "the drivers did not have responsibility for the maintenance" and the drivers were required to allow 3PD to maintain the vehicles, with a deduction from their accounts for maintenance expenses. In that respect, the ALJ concluded, the parties' relationship did not comply with the requirement of ORS 657.047 that the person leasing the vehicle to the for-hire carrier "personally * * * maintains the equipment and provides service thereto."

Thus, the ALJ concluded for three reasons that 3PD had failed to meet its burden to establish the employment exemption set forth in ORS 657.047(1)(b): (1) 3PD had failed to establish that drivers "furnished" vehicles to 3PD; (2) 3PD had failed to establish that drivers leased vehicles to 3PD; and (3) 3PD had failed to establish that drivers "maintained" the equipment allegedly furnished to 3PD.

In its first assignment of error, 3PD assigns error to that ruling.[2] 3PD's primary contention under its first assignment is that the ALJ erroneously interpreted ORS 657.047(1)(b) to require that, in order to show that the driver "furnished" a vehicle, 3PD must show that the driver had an "ownership-type" interest in vehicles leased back to 3PD. It devotes considerable briefing to the argument that, under ORS 657.047, a driver need not have an ownership or "ownership-type" interest in the vehicle in order to "furnish" it. Rather, 3PD contends, it is clear from the statute that individuals who possess their equipment by

_____

[2] At oral argument, the department asserted for the first time that 3PD has challenged on review only two of the three bases for the ALJ's conclusion that 3PD's drivers were not exempt: that 3PD (1) had failed to establish that drivers "furnished" vehicles to 3PD and (2) had failed to establish that drivers leased vehicles to 3PD. The department contended that, in the absence of a challenge to the ALJ's conclusion that drivers did not maintain the vehicles, the ALJ's conclusion that 3PD had not established its entitlement to the exemption must be affirmed, because maintenance is a necessary component of the exemption. Although 3PD did not make a separate assignment with regard to the ALJ's determination as to the maintenance question, it did challenge the ALJ's ruling on the exemption, which encompassed the maintenance issue, and asserted in its statement of facts that under the MVLA and the ICOA drivers were responsible for maintaining the vehicles. Further, the maintenance issue was intertwined with the question whether the documents and evidence of the parties' practices showed that the drivers had "furnished" vehicles. We conclude for those reasons that the maintenance issue is properly before us on judicial review.

virtue of a lease, rather than by ownership, can furnish a vehicle and satisfy the requirement for the exemption. We need not decide whether 3PD's interpretation of the statute is the correct one, because we respectfully disagree with 3PD's understanding of the ALJ's order. It is true that, in addressing the question whether 3PD's drivers "furnished" vehicles, the ALJ stated:

> "Because the drivers never held title to the property and never held any real control over the motor vehicle equipments, they were not furnishing vehicles. In reality, [3PD] furnished the motor vehicle equipment to the drivers to perform services for [3PD]."

The ALJ's reference to "title" might be understood to indicate that the ALJ concluded that drivers must have an *ownership* interest in the vehicles. However, a reading of that statement in the context of the entire order shows that, contrary to 3PD's contention, the gravamen of the ALJ's conclusion was not that 3PD had failed to show that the drivers had an ownership interest in the vehicles. Rather, the ALJ reasoned that drivers can "furnish" a vehicle pursuant to ORS 657.047 only if they possess an interest that can be transferred. We agree with that conclusion.

As the department points out, the word "furnish" means "to provide or supply with what is needed, useful, or desirable : EQUIP[.]" *Webster's Third New Int'l Dictionary* 923 (unabridged ed 2002). Additionally, the exemption applies to persons who lease "*their* equipment" to a for-hire carrier. (Emphasis added.) The unmistakable implication of the use of the word "their" is that the person furnishing the vehicle to the for-hire carrier has a transferable interest in the vehicle. The ALJ concluded that, considered in the context of the requirements of the ICOA and the actual practice of 3PD with respect to its drivers' interests in the vehicles, the MVLA was a "legal fiction," because it did not provide a driver a possessory interest in the vehicle that could be transferred by lease back to 3PD so as to furnish the vehicle to a for-hire carrier.

The ALJ was correct. Considering the interrelationship of the ICOA, the MVLA, and 3PD's practices, it is evident that the lease/lease-back arrangement provides a paper trail of transactions designed to fulfill the requirements for exemption under ORS 657.047, without a practical basis in fact. *See Byrne Trucking, Inc. v. Emp. Div.*, 284 Or 443, 446, 587 P2d 473 (1978) (individuals who entered into contracts with common carrier pursuant to arrangement whereby equipment was leased by the carrier to the operators who in turn leased it back to the carrier had no practical ownership rights in the trucks, and services rendered were employment). Just because the MVLA is called a "lease" does not mean that it creates an interest in the vehicle that the driver could lease back to the vehicle's owner.[3] When the MVLA and the ICOA are considered together, it is apparent that, other than the authority to drive the vehicles for 3PD while the drivers were in compliance with the ICOA, drivers had no further authority over the vehicles or their maintenance. Thus, we agree with the ALJ that the drivers had no interest in the vehicles that could be leased back or "furnished" to 3PD, so as to satisfy the requirement of ORS 657.047, that a vehicle be leased to a for-hire carrier.[4] Our conclusion is dispositive of 3PD's first assignment of error, and we therefore need not address the ALJ's conclusions that the lease back to 3PD failed for lack of consideration or that the drivers did not maintain the vehicles, as required by ORS 657.047.

In its second assignment of error, 3PD contends that the department miscalculated 3PD's unemployment tax liability. In calculating 3PD's tax liability, the department's tax division referred to the amounts shown as taxable income on the Form 1099 provided by 3PD to the drivers. 3PD contends that that approach was mistaken, because the amount stated on a driver's Form 1099 included more than just wages. It asserts that a significant portion of the compensation reflected on the Form 1099 is attributable

---

[3] The Supreme Court has recognized that it is the substance of an agreement, not its label, that determines its legal effect. *Logan v. D. W. Sivers Co.*, 343 Or 339, 347, 169 P3d 1255 (2007).

[4] We need not, and do not, decide whether ORS 657.047 requires that persons who lease vehicles to a for-hire carrier have an ownership, as opposed to a leasehold, interest in the vehicle.

to 3PD's lease of the vehicle and other business expenses. According to 3PD's witness, at most 40 percent of the driver's compensation is attributable to driving services; thus, only 40 percent of the income reported on the Form 1099 should be considered wages for purposes of calculation of 3PD's tax liability. 3PD also asserts that approximately 60 percent of the compensation shown on the Form 1099 is the drivers' "business expenses," which they pay out of their 1099 compensation "and any other source of revenue they may have, and then are free to take a tax deduction on account of those expenses if they so chose."[5]

In rejecting 3PD's contention, the ALJ explained that 3PD did not provide any evidence to show what net amount drivers were actually paid as wages other than the amounts stated on the Form 1099. 3PD asserts that it provided settlement sheets showing "that it would have been possible for [the department's tax division] to calculate the owner-operators' 'wages' based on their net compensation, as opposed to their Form 1099 compensation[.]" We have examined the sampling of settlement sheets submitted into evidence by 3PD and conclude that the ALJ's determination that 3PD has not satisfied its burden to show the actual amount of its taxable payroll is supported by substantial evidence.

In its final assignment, 3PD contends that the ALJ erred in excluding from the record an excerpt from the Basic Manual of the National Council on Compensation Insurance, which is a rating organization that states risk classifications for the purpose of establishing the amount of workers' compensation insurance premium an employer must pay. 3PD offered the excerpt as evidence that drivers are paid consideration for their vehicle leases. In light of our resolution of 3PD's first assignment of error, 254 Or App at 189, we need not address the contention. For the same reason, we reject 3PD's contention that the ALJ erred

---

[5] The department's auditor explained that, for each tax year, there is a set taxable wage base. In the tax year 2006, the set wage base was the first $28,000 of wages paid to the individual. In 2007, the set wage base was the first $29,000 of wages paid to the driver. Thus, 3PD was not assessed tax on wages above $28,000 paid to any driver in 2006, or on wages above $29,000 paid to any driver in 2007.

in excluding from evidence a report of the United States Bureau of Labor and Statistics regarding the wages of truck drivers.

Affirmed.