Argued and submitted December 19, 2014; assessments relating to owner-operators who owned their vehicles outright reversed and remanded, otherwise affirmed July 20, 2016

MAY TRUCKING COMPANY,
an Idaho corporation,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71261; A151597

379 P3d 602

Gordon T. Carey, Jr., argued the cause and filed the briefs for petitioner.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## GARRETT, J.

This petition for judicial review by May Trucking Company challenges an order of an administrative law judge (ALJ) for the Office of Administrative Hearings upholding an Employment Department notice of assessment showing that May is entitled to a tax credit of $45,101.16 for an overpayment of unemployment compensation taxes for the calendar years 2007 and 2008 (the audit period). May contends that it is entitled to a larger tax credit, for two reasons. First, May argues that the ALJ erred in determining that the "base of operations" for May's employee drivers, for purposes of determining the location of employment, was the location where the drivers parked their vehicles during extended down time. Second, May argues that the ALJ erred in concluding that the services of "owner-operator" drivers constitute "employment" that is not exempt under ORS 657.047.

The department's tax assessments are *prima facie* correct, ORS 657.683(4), and an entity challenging an assessment has the burden to establish that it was not the employer of the person performing the services or that the payments subject to the assessment are excluded from taxation for some other reason. *Mitchell Bros. v. Emp. Div.*, 284 Or 449, 451, 587 P2d 475 (1978). On judicial review, we review the ALJ's order upholding an assessment for substantial evidence and errors of law. ORS 183.482(8)(a), (c). For the reasons explained in this opinion, we reverse the assessment in part and remand for reconsideration.

We summarize first those facts that bear on the ALJ's determination of the employee drivers' "base of operations." May is a trucking company licensed and authorized by the United States Department of Transportation to provide interstate transportation services. May pays remuneration to approximately 1,000 drivers to haul freight in the 48 contiguous states. May considers approximately 800 of those drivers to be employees and reports their earnings accordingly, on Internal Revenue Service (IRS) Form W-2. May considers approximately 200 of its drivers to be independent contractors, and reports their earnings on IRS Form 1099.

At the relevant time, May had six operating centers throughout the United States. Drivers were assigned to a particular operating center. Drivers were dispatched out of their assigned operating center via a QualComm mobile communication and tracking system that drivers were required to purchase or rent from May and have installed on their trucks. During the audit period, May reported the employee drivers' wages for purposes of unemployment insurance to the state from which the drivers received their dispatch orders.

By federal regulation, drivers are not allowed to drive more than 70 hours in an eight-day period, after which they must take a 34-hour break, which May refers to as "down time." During periods of down time, drivers were required to park the trucks at a secure location, such as a May "drop yard," a truck stop, or a Walmart parking lot. With approval from May, a driver could also park a truck at his or her home. The department determined that a driver's wages should be reported to the state in which the driver regularly parked the truck during extended down times— *i.e.*, periods longer than 34 hours.

Oregon's unemployment compensation program is a joint federal-state program. *Charles C. Steward Mach. Co. v. Davis*, 301 US 548, 574-78, 57 S Ct 883, 81 L Ed 1279 (1937); *Puget Sound B. & D. v. S. U. C. C.*, 168 Or 614, 620, 126 P2d 37 (1942). If Oregon complies with minimum federal standards, employers receive a credit against their federal tax liability for money paid to the state's unemployment insurance fund. 26 USC § 3302.

The location of a worker's employment determines an employer's reporting obligation for purposes of unemployment insurance tax. The first issue on judicial review concerns the "base of operations" for May's employee drivers, and whether a given driver's services are "employment" in Oregon, such that the driver's wages should be reported in Oregon.

"Employment," for purposes of unemployment insurance, is defined in ORS 657.035, which provides, as relevant:

> "(1)   The term 'employment' includes an individual's entire service, performed within, or both within and without, this state if:
>
> "(a)   The service is localized in this state; or
>
> "(b)   The service is not localized in any state, and such service is not covered under the unemployment compensation law of any other state, the Virgin Islands or Canada, and
>
> "(A)   *The base of operations is in this state, or if there is no base of operations, then the place from which the service is directed or controlled is in this state,* or
>
> "(B)   The base of operations or place from which such service is directed or controlled is not in any state in which some part of the service is performed but the individual's residence is in this state."[1]

(Emphasis added.) It is undisputed that the services provided by May's drivers are not "localized" in Oregon or in any other state, and that the drivers' services are not covered by the unemployment compensation law of any other state. ORS 657.035(1)(b). The dispute on judicial review focuses on the italicized text, which provides that an employee's services constitute employment reportable in Oregon if the employee's "base of operations" is in this state or, if there is no base of operations, the services are "directed and controlled in this state." ORS 657.035(1)(b)(A).

The term "base of operations" is not defined in ORS 657.035. But, the parties agree that long-established and well-settled criteria exist for determining a worker's base of operations and that the term should be interpreted in this case consistently with those criteria. With the exception of a

---

[1] The basic principles for determining the situs of employment for purposes of unemployment compensation law have changed little since the law's inception. In *Puget Sound*, the Supreme Court explained that Oregon's unemployment compensation law includes a definition of "employment" "adopted by most states that determines coverage based on:

"(1)   Place where work is 'localized';

"(2)   Situs of 'base of operations';

"(3)   Situs of 'place from which such service directed or controlled';

"(4)   Situs of employees' 'residence.'"

168 Or at 622.

brief period from 1973 to 1977, the term "base of operations" has been a part of Oregon law since the Unemployment Compensation Act first was enacted, OCLA § 126-702(f)(A) (1935). The term was removed from the statute in 1973, at the request of the department (then the Oregon Employment Division), but readopted in 1977, again at the request of the department, for consistency with the laws of other states. Or Laws 1977, ch 295, § 2.

The United States Department of Labor, which federally administers the unemployment compensation program, periodically issues "program letters" to inform states of its interpretations of the controlling federal law. In Program Letter No. 291 (July 1, 1952), the Department of Labor described "base of operations" as

> "the place or fixed center of more or less permanent nature from which the employee starts work and to which he customarily returns in order to receive instructions from his employer or communications from his customers or other persons to replenish stocks and materials, to repair equipment, or to perform any other functions necessary to exercise his trade or profession at some point or points."

Program Letter 291 had been published when the Oregon legislature readopted "base of operations" in 1977 for purposes of determining the place of employment for employees who work in multiple states. We assume that the legislature was aware of the federal interpretation of "base of operations" when it readopted the term in 1977, and the parties agree that the criteria described in Program Letter 291 guide the determination here.[2] *See Zimmerman v. Allstate*

---

[2] They also agree that it is the employee's, not the employer's, "base of operations," that matters.

Both parties also note that OAR 150-314.660(2)(4), which implements ORS 314.660 relating to the determination of the payroll factor in the apportionment of business income paid in Oregon, states almost the identical test:

> "The term 'base of operations' is the place of more or less permanent nature from which the employee starts work and to which the employee customarily returns in order to receive instructions from the taxpayer or communications from customers or other persons, or to replenish stock or other materials, repair equipment, or perform any other functions necessary to the exercise of the trade or profession."

Under ORS 314.660, "[c]ompensation is paid in this state if:

> "(a) The individual's service is performed entirely within the state;

*Property and Casualty Ins.*, 354 Or 271, 280, 311 P3d 497 (2013) (when a term has acquired a specialized meaning in a particular industry or profession, the court assumes that the legislature used the term consistently with that specialized meaning).

In determining that May's drivers had a base of operations in Oregon, the ALJ did not refer to the criteria described in Program Letter 291. Rather, citing *Springfield Education Assn. v. School Dist.*, 290 Or 217, 227-28, 621 P2d 547 (1980) (describing an "inexact term" as a complete expression of legislative intent, leaving it to the agency to interpret the term and apply it in specific factual situations), the ALJ reasoned that "base of operations" is an "inexact term" and that, if the department's interpretation is consistent with the policy expressed in ORS 657.035, then it is entitled to "an appropriate degree of assumptive validity," *Springfield*, 290 Or at 227-28 (stating that an agency's interpretation of an inexact term may be given "an appropriate degree of assumptive validity" if the agency was involved in the legislative process), because the department was involved in the legislative process and had expertise relating to the application of the statute to varying facts. The ALJ explained that the department's determination was based on its observation of a "pattern" among May's drivers:

> "For extended down time, drivers usually dropped off and picked up their tractors at a May facility, or other approved, secure location, near their homes; *i.e.*, in the same state where the driver resided, regardless of the state from which they were dispatched."

Without further explanation, the ALJ determined that the department's interpretation of "base of operations" as "the state in which drivers drop off their tractors at the start

---

"(b) The individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's services within the state; or

"(c) Some of the service is performed in the state and (A) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (B) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state."

of extended down time and pick up their tractors after extended down time" is consistent with the policy expressed in the statutory text and is entitled to deference. The ALJ therefore upheld the department's determination that the earnings of drivers who park their trucks in Oregon during extended down time should be reported to Oregon.

In its first and second assignments of error, May contends that the ALJ erred in upholding the department's determination that a driver's base of operations can be determined based on the place where a vehicle is parked. May contends that the place where the vehicle is parked during an extended down time does not bear any relationship to the considerations described in Program Letter 291 that both parties agree are relevant to determining the employee's base of operations, all of which point to some connection with the work. The department responds, simply, that the department's interpretation is consistent with the way other states have addressed the question and that it implements the legislature's intent.

We conclude, although for reasons different from those expressed by the ALJ, that the department's determination is correct, because it constitutes an application of the term "base of operations" that is consistent with the recognized meaning of the term and that is supported by substantial evidence. The ALJ's order does not articulate or disavow the well-established criteria in Program Letter 291 for determining an employee's "base of operations" that both parties agree are applicable. Nor does the order explain what relationship, if any, the parking location during extended down time has to those criteria. However, it is undisputed that the parking location is the place where a driver starts work after an extended down time, and that drivers received their dispatches, *i.e.*, their work instructions, at their trucks, through May's QualComm communication system. Those circumstances support a finding that a driver's truck—rather than the May operating center— is the location where the driver receives instructions and begins work, as referenced in Program Letter 291. We conclude for that reason that substantial evidence supports the ALJ's order upholding the department's determination that

the employee drivers' parking locations during extended down time meet the criteria for a "base of operations" under ORS 657.035.

We turn to the third assignment of error. In addition to its approximately 800 employee drivers, May uses the services of approximately 200 drivers that it classifies as "owner operators." May challenges the ALJ's determination that the services of those owner-operators constitute "employment" under ORS 657.035(1) that is not exempt under ORS 657.047.

ORS 657.047 provides, in part:

"(1)  As used in this chapter, 'employment' does not include:

"* * * * *

"(b)  Transportation performed by motor vehicle for a for-hire carrier by any person that leases their equipment to a for-hire carrier and that personally operates, furnishes and maintains the equipment and provides service thereto.

"(2)  For the purposes of this chapter, services performed in the operation of a motor vehicle specified in subsection (1) of this section shall be deemed to be performed for the person furnishing and maintaining the motor vehicle."

Thus, under ORS 657.047, an exemption from "employment" exists (1) when a person leases "their equipment" to a for-hire carrier; (2) performs transportation services for the for-hire carrier; and (3) personally operates, furnishes and maintains the equipment. ORS 657.047(1)(b). The services performed in operation of the vehicle for the for-hire carrier are deemed to be performed for the person furnishing and maintaining the motor vehicle, rather than the for-hire carrier. ORS 657.047(2). Thus, the person driving the vehicle is deemed to be an employee of the person furnishing and maintaining the vehicle and not an employee of the for-hire carrier. We have discussed that exemption extensively in *3P Delivery, Inc. v. Employment Dept. Tax Section*, 254 Or App 180, 295 P3d 83 (2012), and in two opinions issued this date, *Market Transport, Ltd. v. Employment Dept.*, 279 Or App 515, 379 P3d 608 (2016), and *Delta Logistics v.*

*Employment Dept. Tax Section*, 279 Or App 498, 379 P3d 783 (2016).

During the audit period, 70 of May's contract drivers either leased or purchased their vehicles from May, which they then "leased back" to May. May's agreement leasing vehicles to drivers gave the lessee exclusive possession, control, and use of the leased vehicle. But, the agreement also required that the driver use only May as its interstate carrier during the lease period and that May perform all maintenance on the vehicle. The agreement provided, further, that the "lessee has not acquired, and will not acquire * * * any proprietary rights, security interest, equity interest, or any other interest other than that it is a lessee, in a leased vehicle." It provided that the lessee could not rent, lend, mortgage, lien, encumber, or transfer the leased vehicle, and could not transfer any part of its rights or obligations under the lease agreement without prior written consent of the lessor.

May's agreement with drivers who were purchasing their vehicles from May similarly required the drivers to enter into an operating agreement and equipment maintenance agreement with May. The agreement stated that the transfer of physical possession of the equipment to the purchaser created a "bailment only" and that the purchaser did not acquire title or any proprietary rights or interest in the equipment until the purchase price was paid in full.

As we held in *3P Delivery*, 254 Or App at 188-89, in order to "furnish" "their equipment" to the for-hire carrier, the person furnishing the vehicle must have a transferable interest in the vehicle. We agree with the ALJ that the documents under which the contract drivers were leasing or purchasing their vehicles from May did not provide the drivers with an interest in the vehicles that could be leased back to May. For the reasons explained in *3P Delivery, id.*, we conclude that the services provided by the drivers who were leasing or purchasing their vehicles from May did not qualify for exemption under ORS 657.047.

May also used the services of approximately 130 "contractors" who owned their vehicles outright and who

leased their vehicles to May pursuant to an "Independent Contractor Agreement" (IC agreement). The first paragraph of the IC agreement, captioned "lease," provided that the contractor granted the use of the identified equipment to May, "with driver," for interstate transport, in exchange for compensation. The contractor warranted in the IC agreement that he or she had title to the equipment and was authorized to contract the exclusive use, possession, and control of the equipment to May "for the duration of the Agreement[.]" The contractor was required to provide competent drivers who met May's standards and state and federal requirements. The contractor was required to maintain the equipment and to have it inspected at the contractor's expense. The remuneration for the equipment and the driver's services was described in an appendix to the agreement, and provided for compensation at a given rate per dispatched mile.

The ALJ determined that the IC agreement failed as a lease under ORS 657.047 for several reasons. First, the ALJ concluded that the lease lacked a definite duration. The IC agreement provided that it began from the date stated in the lease, and "shall terminate at such time as either Carrier or Contractor terminates this Agreement for any reason by giving thirty (30) days written notice." The IC agreement also gave May the right to terminate the agreement upon breach immediately, and without notice. The ALJ concluded that the absence of a definite end date prevented the agreement from stating a definite duration, which the ALJ reasoned was an essential element of a lease, citing *Avis Rent A Car System, Inc. v. Dept. of Rev.*, 330 Or 35, 39, 995 P2d 1163 (2000) (the three essential elements of a lease of real property are "a description of the property, the duration of the term, and the rental consideration").

May contends that there is no requirement that a lease specify an end date, as long as it is possible to determine the circumstances under which the lease terminates. We agree. A lease of personal property that does not state a specific duration is construed to be terminable at will. *Shepherd v. Hub Lumber Co.*, 273 Or 331, 338, 541 P2d 439 (1975) (a lease of personal property for an indefinite period of time is ordinarily terminable at any time at the will of

either party); *see Lund v. Arbonne International, Inc.*, 132 Or App 87, 90, 887 P2d 817 (1994) (agreement for an indefinite period may be terminated at will when reasonable notice is given). Although the IC agreement did not include an end date, in the absence of a specific duration, the lease continued until it was terminated at will by either party. We conclude that the ALJ erred in determining that the lease failed for lack of a specific duration.

Second, the ALJ concluded that the lease failed because of an absence of consideration for the use of the equipment. As noted, the IC agreement provided for remuneration for the use of the equipment and the driver's services based on mileage. But it did not allocate remuneration specifically for May's use of the vehicle or for the truck's "idle time." The ALJ concluded for those reasons that the IC agreement failed as a lease for lack of consideration for use of the vehicle. We have rejected the identical reasoning in *Market Transport, Ltd. v. Employment Dept.*, 279 Or App 515, 379 P3d 608 (2016), and we reject it here. The ALJ erred in determining that there was no lease because the agreement did not separately state consideration for the use of the equipment.

Third, the ALJ concluded that May had not met its burden to show that the contractors "personally" maintained their vehicles. ORS 657.047(1)(b) requires that, to qualify for exemption, a person furnishing a vehicle must "personally" maintain it. The IC agreement required contractors to maintain their vehicles and to pay the cost of maintenance. Contractors who owned their vehicles were permitted, but not required, to use May's maintenance services, and May established escrow accounts for each contractor, to facilitate deductions for maintenance and repairs. The ALJ found that, "as a practical matter," contractors had their equipment serviced at May's facilities, and concluded that, although drivers "nominally" paid for those services, they did not personally perform them.

May contends that the ALJ erred in interpreting the statute to require that the contractor personally provide the labor for the maintenance of vehicles. The department responds that the statutory text is clear and requires that

the person leasing the vehicle "personally" maintain it. We are persuaded that a contractor with financial responsibility under an agreement for the maintenance of equipment, and the freedom under an agreement to select a third party to perform maintenance, satisfies the requirement for personally performing the maintenance under ORS 657.047, and that the legislature did not intend to limit the exemption to those who physically perform the labor. *See Webster's Third New Int'l Dictionary* 1686 (unabridged ed 2002) (defining "personally" as "as oneself : on or for one's own part"). We therefore conclude that the ALJ erred in determining that the exemption of ORS 657.047 was unavailable because the contractors did not personally maintain their equipment.

Finally, May challenges the ALJ's determination that contractors who hired other drivers did not personally operate the vehicles within the meaning of ORS 657.047(1)(b). We agree that the ALJ erred for the reasons stated in *Delta Logistics v. Employment Dept. Tax Section,* 279 Or App 498, 379 P3d 783 (2016).

Assessments relating to owner-operators who owned their vehicles outright reversed and remanded; otherwise affirmed.